SUBURBAN UTILITY CORPORATION,
Appellant,

v.

PUBLIC UTILITY COMMISSION OF
TEXAS, Appellee.

No. C–1733.

Supreme Court of Texas.

May 18, 1983.

Rehearing Denied July 6, 1983.

Sears & Burns, Robert L. Burns, Houston, for appellant.

· Jim Mattox, Atty. Gen., Fernando Rodriguez, Asst. Atty. Gen., Austin, for appellee.

BARROW, Justice.

This is a direct appeal by Suburban Utility Corporation, a small two shareholder

water utility serving six unincorporated areas in Harris County, from a district court judgment sustaining a rate and plant improvement order rendered by the Public Utility Commission (PUC). We hold the PUC's rate order is not supported by substantial evidence in the record. The district court judgment is reversed and the cause is remanded to the PUC for further proceedings consistent with this opinion.

In October, 1976, the PUC instituted proceedings to determine the propriety of the rates being charged by Suburban. Suburban did not seek a rate increase. After a two day evidentiary hearing before an examiner, which was concluded on April 28, 1977, the PUC entered a final order on December 6, 1977.[1] This order reduced Suburban's water rates and ordered extensive improvements to its plants. The PUC found the cost of service for Suburban to be $156,122, and granted Suburban a 4.43 percent rate of return on an adjusted value of invested capital rate base of $342,010. Suburban filed a motion for rehearing which was denied.

Suburban appealed to the District Court of Travis County and requested temporary and permanent injunctive relief. A temporary injunction was issued on April 3, 1978, but was dissolved by the court's final judgment on September 8, 1982[2] affirming the PUC's order and refusing Suburban a permanent injunction. On December 10, 1982, we denied Suburban's request for temporary injunctive relief pending the outcome of this appeal.

Suburban raises twelve points of error here. It challenges the findings of the PUC relating to cost of service, rate base, rate of return and rate design. At the outset, however, we must consider Suburban's contention that the final order of the PUC is void because it was not rendered within sixty days after the final hearing.

■ Section 16(d) of the Administrative Procedure Act (APA), article 6252–13a[3] provides, "the final decision or order must be rendered within 60 days after the date the hearing is finally closed." The PUC Rules of Practice and Procedure contain a similar provision. 16 Tex.Admin.Code § 21.54. In *Lewis v. Jacksonville Building & Loan Association,* 540 S.W.2d 307, 310 (Tex.1976), we said:

There is no absolute test by which it may be determined whether an administrative rule or regulation is mandatory or directory. The prime object is to ascertain and give effect to the intent of the rule or regulation. Although the word "shall" is generally construed to be mandatory, it may be and frequently is held to be directory. In determining whether the administrative agency intended the provision to be mandatory or directory, consideration should be given to the entire rule, its nature, objects and the consequences which would result from construing it each way. Provisions which do not go to the essence of the act to be performed, but which are for the purpose of promoting the proper, orderly, and prompt conduct of business, are not ordinarily regarded as mandatory. If the provision directed doing of a thing in a

1. An interim order was rendered on October 26, 1976 requiring Suburban to charge rates set by the Harris County Commissioners Court pursuant to article 2372q–1 of the Texas Revised Civil Statutes Annotated in its Castlewood Subdivision service area until a final order was rendered. All other subdivisions served by Suburban were to be charged interim rates identical to those in effect as of September 1, 1976. In November 1976, Suburban requested that the Travis County district court enjoin the PUC from enforcing the interim order. The court granted Suburban a temporary injunction on September 30, 1976, which was dissolved by the PUC's final order.

2. The nature of this proceeding undoubtedly contributed to the long delay. Suburban did not seek a rate increase and, by virtue of two temporary injunctions, was permitted to charge under its present rate schedule pending final determination. Such a long delay defeats the primary purpose of the Public Utility Regulatory Act, "to assure rates, operations, and services which are just and reasonable to the consumers and to the utilities." Tex.Rev.Civ.Stat. Ann. art. 1446c, § 2.

3. All statutory references are to Texas Revised Civil Statutes Annotated.

certain time without any negative words restraining it afterwards, the provision as to time is usually directory.

Section 16(d) is designed to promote the proper, orderly and prompt conduct of business by the agency. *Railroad Commission of Texas v. City of Fort Worth,* 576 S.W.2d 899 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). It is not intended to fix a time limitation upon the power of administrative agencies to render decisions after expiration of the sixty days mentioned. While the delay presented by determination of the rate in this case demonstrates the need for prompt disposition of ratemaking proceedings, the legislature did not intend that late decisions be invalidated. We, therefore, hold the sixty day provision of section 16(d) is directory and the failure of the PUC to render its decision in this case within that time period did not make the order void. We also recognize that Suburban was not harmed by the delay as it was able to charge higher rates during this interim.

■ In Texas, a proper rate determination is based upon consideration of three factors: (1) the utility's reasonable operating expenses; (2) the rate base and; (3) a reasonable rate of return. *Railroad Commission of Texas v. Entex, Inc.,* 599 S.W.2d 292, 294 (Tex.1980); *Southwestern Bell Telephone Co. v. Public Utility Commission,* 571 S.W.2d 503, 512–16 (Tex.1978); *Railroad Commission of Texas v. Houston Natural Gas Corp.,* 155 Tex. 502, 289 S.W.2d 559, 573 (1956). First, there must be a determination by the regulatory authority of the utility's reasonable operating expenses. After deciding what utility property will be included in the rate base, the next step is the rate base calculation. After the rate base is determined, the regulatory authority determines the rate of return, or the percent of the rate base which will be recoverable in revenues by the utility.

■ A fundamental principle of ratemaking is that regulated public utilities are entitled to rates which will allow them to collect total revenues equal to their cost of service. P. Garfield & W. Lovejoy, *Public Utility Economics* 56 (1964). The cost of service of a public utility is defined as a sum total of: (a) reasonable operating expenses, (b) depreciation expense, (c) taxes, and (d) a fair and reasonable return. 16 Tex.Admin.Code § 23.22(a). Such expenses are limited to amounts actually realized or which can be anticipated with reasonable certainty. *E.g. Federal Power Commission v. United Gas Pipe Line Co.,* 386 U.S. 237, 242, 87 S.Ct. 1003, 1006, 18 L.Ed.2d 18 (1967); J. Bauer, *Updating Public Utility Regulation* 11, 139–40 (1966); 1 J. Priest, *Principles of Public Utility Ratemaking* 54 (1969); *Public Utility Economics* at 45–46, 392.

■ The PUC's ratemaking power includes the discretion to disallow improper expenses. *See* Public Utility Regulatory Act (PURA), art. 1446c, § 41(c)(3). The effect of this policy of "disallowance" is to charge the expense in question to the utility's stockholders instead of to the ratepayers. Such a policy, however, is not without hazard. Under the cost of service method of regulation, the disallowance of certain expenses results in the reduction of the return earned on the rate base. To the extent that the return is diminished by disallowed expenses, the credit standing of the utility may be weakened, a fact which would be reflected in terms of the ease of obtaining necessary financing or attracting new investors. Under section 39 of the PURA, a utility must be allowed to recover its operating expenses together with a reasonable return on its invested capital. *Railroad Commission of Texas v. High Plains Natural Gas Co.,* 628 S.W.2d 753 (Tex.1981) (per curiam). This requirement is met only if the return is sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *Bluefield Water Works & Improvement Co. v. Public Service Commission of the State of West Virginia,* 262 U.S. 679, 692–93, 43 S.Ct. 675, 678–79, 67 L.Ed. 1176 (1923); *Railroad Commission of Texas v. Entex, Inc.,* 599 S.W.2d at 295–96; *Railroad Com-*

*mission of Texas v. Houston Natural Gas Corp.,* 289 S.W.2d at 572. Therefore, it is important that regulatory agencies do not arbitrarily disallow expenditures. If the expense can be shown to be actual, necessary and reasonable it should be allowed. M. Farris & R. Sampson, *Public Utilities: Regulation Management and Ownership* 95 (1973).

■ Suburban urges that the PUC's cost of service findings are not supported by substantial evidence and are arbitrary and capricious. Specifically, Suburban urges that the PUC erred in disallowing a federal income tax expense as a cost of service. During the test year of 1976, Suburban operated as a Subchapter S corporation under the Internal Revenue Code; therefore, no taxes were paid by the corporation. All profits realized by the utility were paid to the two shareholders as if the corporation were a partnership and the shareholders paid taxes on it as ordinary income. At the ratemaking proceeding, Suburban submitted the sum of $9,831.12 as the amount of federal income taxes it would have to pay had it been a conventional corporation. The PUC, however, refused to allow the federal income tax expense on the basis that hypothetical taxes should not be allowed a corporation having no legal tax liability.

Under Subchapter S of the Small Business Corporation Act, 26 U.S.C.A. §§ 1371–79, a corporation may elect a tax status which protects the earnings and profits of the corporation from conventional corporate tax rates. Nevertheless, the income of the Subchapter S corporation is taxable. All undistributed income of the corporation is distributed pro rata to the shareholders who must pay taxes on it as ordinary income. Therefore, for purposes of federal income taxation, the shareholders of the Subchapter S corporation are accountable for all that pertains to the corporation.

The propriety of including all taxes among cost of service expenses has been long established. In *Galveston Electric Co. v. City of Galveston,* 258 U.S. 388, 399, 42 S.Ct. 351, 356, 66 L.Ed. 678 (1922), Justice Brandeis, speaking for a unanimous court, announced that in calculating a proper return on utility property, "[I]t is necessary to deduct from gross revenue the expenses and charges," including "all taxes." The Court then said, "There is no difference in this respect between state and federal taxes or between income taxes and others." *Id.* at 399, 42 S.Ct. at 356; *see also Georgia Railway & Power Co. v. Railroad Commission of the State of Georgia,* 262 U.S. 625, 632–33, 43 S.Ct. 680, 682, 67 L.Ed. 1144 (1923). Under the PUC's substantive rules, cost of service includes "income taxes on a normalized basis." 16 Tex.Admin.Code § 23.22(a)(4).

In *Verna S. Moyston v. New Mexico Public Service Commission,* 76 N.M. 146, 412 P.2d 840, 846–51 (N.M.1966) the New Mexico Commission excluded federal and state income taxes from the operating expenses claimed by a gas distributing utility operating as a sole proprietorship. The Supreme Court of New Mexico reversed the commission ruling. That court held that the State's public utility regulatory act made no distinction between public utilities operated "as individuals, firms, partnerships, companies, [or] corporations." The court added, "For all practical purposes, Mrs. Moyston is the company and she is entitled to and accountable for all that pertains to its operation." It noted that hypothetical tax calculations made for the purpose of allocating income taxes to a public utility "establish that the fundamental inquiry is not limited to technical distinctions, but is determined by practical economic facts." Ultimately, the court observed that the amount the utility would pay if incorporated is *reasonable and much less than that actually incurred by the owner of the utility.* This decision appears to be the only determination by a court of last resort on this question.

The PUC has, more recently, approved the imputation of federal income tax liability to a Subchapter S utility. *See Application of B & B Water Systems, Inc., Docket No. 2351* 4 PUC Bull. 1528, 1531 (May 1979). The tax in that case was calculated under

the corporate tax structure in effect at the time the recommended rates were to be in effect, as if the utility itself paid corporate income tax. In a subsequent decision, the PUC approved a federal income tax allowance for a sole proprietorship on a conventional corporate tax basis. *See Application of Ingram Water Supply, Docket No. 2818* 6 PUC Bull. 579, 586 (May 1981).

The income taxes required to be paid by shareholders of a Subchapter S corporation on a utility's income are inescapable business outlays and are directly comparable with similar corporate taxes which would have been imposed if the utility operations had been carried on by a corporation. Their elimination from cost of service is no less capricious than the excising of salaries paid to a utility's employees would be. We therefore hold that Suburban is entitled to a reasonable cost of service allowance for federal income taxes actually paid by its shareholders on Suburban's taxable income or for taxes it would be required to pay as a conventional corporation, whichever is less.

Suburban alleges several other errors in the PUC's cost of service findings. It urges the PUC improperly disallowed an attorney's fee expense of $6,192 incurred for obtaining a certificate of need and the cost for improvements the PUC ordered Suburban to make to upgrade its system. Suburban also contends the PUC erred in calculating its regulatory expenses and that the fifteen year period of amortization adopted by the PUC is unreasonable. In addition, Suburban argues the PUC erroneously reduced its depreciation expenses by $8,466.

■ Our duty in reviewing the PUC's order establishing the cost of service is to ensure that the decision was based on substantial evidence. *Railroad Commission of Texas v. Entex, Inc.,* 599 S.W.2d at 298; art. 1446c, § 69; art. 6252–13a, § 19(e). The correct substantial evidence rule test is whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Dotson, M.D. v. Texas State Board of Medical Examiners,* 612 S.W.2d 921, 922 (Tex.1981).

Under substantial evidence review, the PUC's order may be overturned only upon showing that "substantial rights of the appellant have been prejudiced." *Vandygriff v. First Savings & Loan Association of Borger,* 617 S.W.2d 669, 672 (Tex.1981); art. 6252–13a, § 19(e).

■ Upon reviewing the record in this case, we conclude the PUC cost of service adjustments are not unreasonable and are supported by substantial evidence. Each adjustment was made upon the basis of expert opinion. Although the PUC's regulatory expense calculation yields approximately $200 less than the total annual recovery Suburban is entitled to under the record, Suburban has failed to show substantial prejudice as a result of this mathematical error.

We now turn to Suburban's allegations regarding the PUC's rate base determination. Suburban argues that the PUC erroneously excluded the sum of $15,078 in customer deposits from its rate base. It is undisputed that this sum should be added to the rate base figure of $342,010. The PUC, however, urges that Suburban failed to allege this point in its motion for rehearing and thus waived the error. We disagree. Suburban's motion for rehearing alleged:

> The finding of fact that the adjusted value of invested capital for Suburban is $342,010 confiscates the property of Suburban and is not reasonably supported by substantial evidence.

■ Section 16(e) of the APA provides that "a motion for rehearing is prerequisite to an appeal." The purpose of such a motion is to provide notice to the agency that the moving party is dissatisfied with its final order and that an appeal will be prosecuted if the ruling is not changed. The legislature did not insert any language into section 16(e) concerning specificity in motions for rehearing. Moreover, where pleadings are required in administrative proceedings, their validity should not be tested by the technical niceties of pleadings and practice required in court trials. *Railroad Commission of Texas v. Magnolia Pe-*

*troleum Co.,* 130 Tex. 484, 109 S.W.2d 967 (1937).

■■■■ We are of the view that section 16(e) requires that the motion for rehearing be sufficiently definite to apprise the regulatory agency of the error claimed and to allow the agency opportunity to correct the error or to prepare to defend it. *See United Savings Assoc. of Texas v. Vandygriff,* 594 S.W.2d 163, 168 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.); *Railroad Commission of Texas v. Missouri Pacific Railroad Co.,* 588 S.W.2d 640, 641 (Tex.Civ.App.— Beaumont 1979, writ ref'd n.r.e.). The motion filed by Suburban was sufficiently specific regarding the primary question for review on appeal. It alleges that adjusted value of $342,010 is not supported by substantial evidence, thereby specifically apprising the PUC that the order fails to meet the test for review of this administrative proceeding. We therefore hold that Suburban's motion for rehearing was sufficient as a prerequisite for appeal and the PUC erroneously excluded the sum of $15,078 from Suburban's rate base.

■■■■ Suburban also urges that the PUC's net plant or invested capital figure of $94,169 is erroneous and in violation of section 41(a) of the PURA [4] because it is based, in part, on the price it paid developers for the plant; that the PUC's adjusted value ratio of 68.8/31.2 percent is not supported by substantial evidence and; that the PUC adopted an age and condition adjustment to current cost which is not sup-

ported by substantial evidence. These contentions are without merit.

The "original cost" valuation method adopted by the PUC was sponsored by an expert and is consistent with the mandate of section 41(a) that the original cost component of the rate base be, "the actual money cost, or the actual money value of any consideration paid other than money, of the [utility] property at the time it shall have been dedicated to public use, ... less depreciation ...." *See* Nichols & Fields, *Rate Base Under the PURA: How Firm is the Foundation?,* 28 Baylor L.Rev. 861, 863–64, 881 (1976). The invested capital figure of $94,169 is based upon the tax basis or purchase price of the system plus subsequently recorded costs, less depreciation and contributions in aid of construction. The PUC's expert testified that in his estimation the purchase price best approximated the original cost when the plant was first placed into service. In addition, there is substantial evidence to support the PUC's finding as to the original cost/current cost ratio under section 41(a). The expert testimony on this issue involved complex calculations designed to strike a fair balance between current and original cost by taking inflationary factors into account. Section 41(a) authorizes the PUC to exercise its discretion in determining a "reasonable" balance, and provides that the PUC "may" consider "inflation" in determining a reasonable balance. The exact balance is within the discretion of the Commission. *Railroad Commission of Texas v. Entex, Inc.,* 599 S.W.2d at 294. The PUC's finding on

4. Section 41(a) provides:
  Sec. 41. The components of adjusted value of invested capital and net income shall be determined according to the following rules:
    (a) Adjusted Value of Invested Capital. Utility rates shall be based upon the adjusted value of property used by and useful to the public utility in providing service including where necessary to the financial integrity of the utility construction work in progress at cost as recorded on the books of the utility. The adjusted value of such property shall be a reasonable balance between original cost less depreciation and current cost less an adjustment for both present age and condition. The regulatory authority shall have the discretion to determine a reasonable balance

that reflects not less than 60% nor more than 75% *original cost, that is, the actual money cost, or the actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation,* and not less than 25% nor more than 40% current cost less an adjustment for both present age and condition. The regulatory authority may consider inflation, deflation, quality of service being provided, the growth rate of the service area, and the need for the public utility to attract new capital in determining a reasonable balance. (emphasis added).

age and condition is also supported by the record. The depreciation method adopted by the PUC in determining age and condition was based upon expert opinion and was shown to be a more appropriate method for determining such adjustment because it took into account factors which present a more precise determination of remaining life of the plant's facilities.

    Suburban also asserts it was denied procedural and substantive due process of law because it relied on an alleged prehearing suggestion by the PUC staff that Suburban derive its original cost component of the rate base pursuant to a valuation method which the PUC subsequently refused to adopt. It is within the PUC's broad discretion to consider and adopt a particular method of rate base valuation as long as it is supported by the administrative record and meets the statutory requirements of section 41(a). *Cf. Texas Alarm & Signal Association v. Public Utility Commission,* 603 S.W.2d 766, 770–773 (Tex.1980); *Railroad Commission of Texas v. Lone Star Gas Co.,* 611 S.W.2d 908, 911 (Tex.Civ.App.—Austin 1981, writ ref'd n.r.e.). As we concluded above, the "original cost" valuation method adopted by the PUC in this case is supported by the record and complies with section 41(a). We overrule Suburban's fourth point of error.

    In its eleventh point of error, Suburban urges the PUC's order is invalid because it fixed rates on the basis of past cost; therefore, the PUC has not fixed rates for the future. Suburban's rates were based on data compiled over the 1976 test year. In making rates, regulatory agencies presumably *do so for* an indefinite period into the future. In order to do so, however, the regulatory agency must rely upon the record of cost of service in a "test period," or test year which is usually the latest twelve months for which there are complete data. *See Public Utility Economics* at 45; *see also* 16 Tex.Admin.Code § 21.2. Consequently, future rates are made on the basis of past costs. Changes occurring after the test period, if known, may be taken into consideration by the regulatory agency to help mitigate the effects of inflation and in order to make the test year data as representative as possible of the cost situation that is apt to prevail in the future. *See City of El Paso v. Public Utility Commission of Texas,* 609 S.W.2d 574, 578 (Tex.Civ. App.—Austin 1980, no writ).

    The PUC did not err in fixing Suburban's rates on the basis of data compiled during 1976. This was the most recent twelve month period for which operating data could have been obtained. If changes occurred after the record was closed and the proceeding terminated, Suburban had the remedy of filing for reduction or increase in rates. *See* art. 1446c, § 42. Furthermore, Suburban never attempted to invoke the PUC's discretion and update the test year data throughout the proceeding and was partially responsible for the delays in this case.

    In its final point of error, Suburban urges that since it did not propose a rate increase and the PUC did not expressly propose to reduce the rate, the PUC had the burden of proof throughout the ratemaking proceeding.

Section 40(b) of the PURA provides:

    In any proceeding involving any proposed change of rates, *the burden of proof to show that* the proposed change, if proposed by the utility, or that *the existing rate* if it is proposed to reduce the rate, *is just and reasonable shall be on the public utility.* (emphasis added).

Suburban's entire case consisted of defending its existing rates. Section 40(b) clearly places the burden of proof on a utility if it is defending its existing rates. We therefore hold Suburban had the burden of proof in this proceeding.

    In its other points of error, Suburban urges the PUC's rate of return and rate design determinations are arbitrary and capricious and not supported by substantial evidence. Since we are remanding this case for redetermination of Suburban's cost of service and rate base, the PUC will be required to reassess the rate of return and

rate design in view of those new findings.[5] It is, therefore, unnecessary to consider these points and we express no opinion as to the holding of the district court thereon.

The judgment of the district court is reversed and the cause remanded to the PUC for redetermination of Suburban's rates.

5. Several months after the PUC's final order in this case, we decided *Southwestern Bell Telephone Co. v. Public Utility Commission of Texas*, 571 S.W.2d 503 (Tex.1978). In that case, we rejected the "dual rate base" concept and held section 41(a) clearly required that the rate of return be based upon the rate base as defined in that section. We have since reaffirmed that holding in *Sunbelt Utilities v. Public Utility Commission of Texas*, 589 S.W.2d 392 (Tex.1979) and *Railroad Commission of Texas v. Entex, Inc.*, 599 S.W.2d 292 (Tex. 1980).