TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00723-CV







Ira W. Black, Jr., Appellant


v.


City of Killeen, Appellee






FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT

NO. 169,363-B, HONORABLE RICK MORRIS, JUDGE PRESIDING





 Appellant Ira W. Black, Jr. appeals the district court's declaratory judgment entered
in favor of the City of Killeen. Black owns five apartment buildings built between 1986 and 2000
in the City of Killeen, a home rule municipality. See Tex. Const. art. XI, § 5; Tex. Loc. Gov't Code
Ann. § 5.004 (West 1999). At issue in this appeal are tap fees assessed by the City for apartment
buildings Black constructed in 1998 and 2000. (1) Prior to 1998, Black paid the City a tap fee per
building connection. (2) In 1998 and 2000, pursuant to a 1997 amendment to the tap fee ordinance,
Black paid a per living unit connection charge. (3) In compliance with the amended fee schedule, but
under protest, Black paid an initial base tap charge, plus an additional $300 water tap fee and $300
sewer tap fee for each living unit in the complexes. 

 Black filed a declaratory judgment seeking a determination that the fees under the
amended ordinance were (i) unreasonable, (ii) invalid impact fees, and (iii) discriminatory. The City
filed a counterclaim, seeking a declaration that the water and sewer tap fees were valid, enforceable,
and not impact fees. At trial, Black called a rate expert, Bruce Fairchild, who testified in support of
Black's position. Black also called Killeen City Manager, David Blackburn, as an adverse witness
to testify regarding various aspects of City policy and the City's process of amending the tap fee
ordinance. The City called its own rate expert, Searcy Willis, to controvert Black's expert witness.

 The district court granted the City's request for declaratory relief and issued findings
of facts and conclusions of law in support of its judgment. In five points of error, Black appeals that
judgment, contending that the district court erred in finding the City's tap fees reasonable, valid, and
non-discriminatory. Because we conclude that Black failed to meet his burden of rebutting the
presumptive validity of the City's tap fee ordinance, we affirm the trial court's judgment.


Standard of Review

 We presume a home rule charter provision is valid and will not interfere with matters
of municipal government unless the provision is shown to be "unreasonable and arbitrary, amounting
to a clear abuse of municipal discretion." Dallas Merchant's & Concessionaire's Ass'n v. City of
Dallas, 852 S.W.2d 489, 490-91 (Tex. 1993); see also City of Brookside Village v. Comeau, 633
S.W.2d 790, 792 (Tex. 1982) ("A city ordinance is presumed to be valid[.]") (citing Thompson v.
City of Palestine, 510 S.W.2d 579, 582 (Tex. 1974); Hunt v. City of San Antonio, 462 S.W.2d 536,
539 (Tex. 1971)). A person challenging an ordinance bears an "extraordinary burden" of
establishing that the municipality abused its discretion in enacting the ordinance. Comeau, 633
S.W.2d at 792-93 (citing Thompson, 510 S.W.2d 579; Waxahachie v. Watkins, 275 S.W.2d 477
(Tex. 1955)). In assessing whether the party attacking an ordinance should prevail, we "consider all
circumstances and determine, as a substantive matter, if reasonable minds may differ as to whether
a particular" ordinance is a reasonable exercise of the municipality's authority. Id. at 793. Where
the trial court issues findings of fact and conclusions of law, we apply a sufficiency of the evidence
review to the factual findings and review its conclusions of law de novo. Anderson v. City of Seven
Points, 806 S.W.2d 791, 794 (Tex. 1991). Thus, although we rely on the fact finder to resolve
disputed facts and accord those facts the same status as if they were determined by a jury, the
ultimate issue of whether the City's tap fee is valid is a question of law. See City of Austin v. Travis
County Landfill Co., 45 Tex. Sup. Ct. J. 511, 2002 Tex. LEXIS 34, at *15 (Mar. 28, 2002). The
Uniform Declaratory Judgments Act does not alter this standard of review. See Tex. Civ. Prac. &
Rem. Code Ann. § 37.010 (West 1997); see also Stephenson v. Leboeuf, 16 S.W.3d 829, 842 (Tex.
App.--Houston [14th Dist.] 2000, pet. denied); Oak Hills Props. v. Saga Rests., Inc., 940 S.W.2d
243, 244 (Tex. App.--San Antonio 1997, no writ).



DISCUSSION

 In four points of error, Black contends that the City's tap fee ordinance is invalid. He
contends that the tap fees (i) "are unreasonable under every standard for judging the reasonableness
of tap fees"; (ii) discriminate "between similarly situated customers and between customer classes
without a reasonable basis"; (iii) are illegal because they constitute impermissible taxation; (4) and (iv)
are impermissible impact fees. In his fifth point of error, Black argues that the district court erred
in denying his request for attorney's fees. Before addressing the validity of the City's tap fee
ordinance, we discuss the home rule charter's history to provide the context for analyzing Black's
contentions.


Home Rule Charter

 Article XI, section 5 of the Texas Constitution authorizes cities having more than five
thousand inhabitants to adopt a home rule charter. See Tex. Const. art. XI, § 5. Adopted in 1912,
the home rule amendment "altered the longstanding practice of having special charters individually
granted and amended by the legislature" for the State's larger cities. 22 David B. Brooks, Texas
Practice: Municipal Law and Practice § 1.17 (2d ed. 1999). The amendment effectively created
home rule cities as "mini-legislatures." See id. Thus, cities adopting a home rule charter "possess
the full power of self government and look to the Legislature not for grants of power, but only for
limitations on their power." City of Dallas, 852 S.W.2d at 490-91. Accordingly, absent legislation
or constitutional provisions to the contrary, a home rule municipality is free to regulate itself in any
manner it chooses. In the context of this appeal, then, we look to the City's ordinance to see, not
whether the City is authorized to amend the tap fee ordinance as it did, but whether the amendment
is prohibited by some constitutional or legislative restraint on the City's authority. See id.


Reasonableness

 Black contends that, "[b]y failing to apply any accepted standard, the trial court erred"
in finding the City's tap fees to be reasonable. Whether a duly enacted ordinance is reasonable is
a question of law. See City of Lucas v. North Tex. Mun. Water Dist., 724 S.W.2d 811, 820 (Tex.
App.--Dallas 1986, writ ref'd n.r.e.) (citing Moncrief v. Tate, 593 S.W.2d 312, 314 (Tex. 1980)). 
In passing upon reasonableness, judicial review is limited to determining whether the municipality
abused its discretion in passing the ordinance. Id. at 820. Because Black is challenging the validity
of the fee assessment ordinance, he bears the burden of showing that it is unreasonable. See
Comeau, 633 S.W.2d at 792. Repeatedly recognized by the supreme court as an "extraordinary
burden," a showing that a duly enacted ordinance is invalid requires Black to establish "'that no
conclusive or issuable fact or condition existed' which would authorize the [City]'s passage of the
ordinance." Id. at 792-93 (quoting Thompson, 510 S.W.2d at 581). To be sure, this standard of
review does not require the City to show that its tap fees are reasonable, but places an affirmative
requirement on Black to show that they are not.

 It is generally accepted that a regulated utility may set its rates to ensure it recoups
its cost of providing utility services. Suburban Util. Corp. v. Public Util. Comm'n, 652 S.W.2d 358,
362 (Tex. 1983); see also James C. Bonbright et al., Principles of Public Utility Rates 1988 (2d ed.
1988) ("A fair-return or fair-profit standard of reasonable rate levels historically has been accepted
with reservations throughout the United States as a controlling basis of rate regulation with respect
to those privately-owned utility companies that have been granted monopoly status by federal and
state governments."). Although there are distinctions between public and private utilities, "in so far
as treatment of customers is concerned, the municipally-owned utility is not different from the
privately-owned utility." City of Texarkana v. Wiggins, 246 S.W.2d 622, 625 (Tex. 1952). 
Recognizing this principle, the Texas Supreme Court set forth factors for judging the reasonableness
of a utility's rate structure in Texas:


[A] proper rate determination is based upon consideration of three factors: (1) the
utility's reasonable operating expenses; (2) the rate base; and (3) a reasonable rate of
return. First, there must be a determination by the regulatory authority of the utility's
reasonable operating expenses. . . . [T]he next step is the rate base calculation. After
the rate base is determined, the regulatory authority determines the rate of return, or
the percent of the rate base which will be recoverable in revenues by the utility.


Suburban Util. Corp., 652 S.W.2d at 362 (citations omitted). (5) These principles support the
proposition that in setting its tap fees the City is not limited to charging only for the direct costs
associated with providing customers a connection to the water and sewer utility system. What is not
clear, however, is what additional costs the City may include in the tap fees and to what extent the
inclusion of these other costs impacts the overall reasonableness of the ordinance.

 Black argues on appeal that had the trial court (i) correctly applied Davis v.
Bartonville Water Supply Corp., 678 S.W.2d 297 (Tex. App.--Fort Worth 1984, no writ), (ii) not
ignored generally accepted ratemaking principles requiring fees to be based on the costs of providing
services, and (iii) actually considered the magnitude of the tap fee increase and how it compared to
rates charged by other similar utilities in the region, it would have found the City's tap fees
unreasonable. We address each argument in turn.

 At oral argument and in his brief, Black acknowledged that Bartonville is not
completely analogous to the case at hand. In that case, the court mistakenly employed terminology
appropriate for rates developed using a utility basis method when, in actuality, Bartonville Water
Supply Corporation operated on a cash basis method. See generally id. The parties agree that
neither "rate base" nor "rate of return"--two of the three factors listed in Bartonville--are applicable
to a utility using the cash basis method, i.e., the City. Black urges us to read Bartonville as standing
for the broad proposition that, "to achieve fairness among customers and for economic efficiency,
a utility's rates and charges should generally reflect the cost of providing a particular service." We
believe that Black correctly interprets that case as standing for the general, well-settled ratemaking
principles that, in determining its rates, a utility must consider certain factors and its final rates must
be reasonable and not unduly discriminatory. See generally Suburban Util. Corp., 652 S.W.2d 358. 
But nothing in Bartonville limits the costs of providing a particular service to the direct costs
associated with physically connecting a customer to the City's water and sewer systems. To the
extent Black contends otherwise, we reject his interpretation of that case.

 Having determined the appropriate scope of Bartonville, we conclude that the district
court correctly applied its holding to the case at hand. In Finding of Fact No. 3, the district court
found that the City "set[] tap fees and rate revenue in an amount sufficient 'to maintain and operate
the [water and sewer] system[s] with due regard for anticipated needs to improve, update, construct,
and maintain [those] system[s].'" The record supports this finding. Even though the City
acknowledged that its approximate cost of physically installing the water tap is $1179 and that its
total tap fees exceed that amount, the district court heard and considered other evidence that would
permit it to conclude the overall tap fee rate was reasonably set.

 For example, City Manager Blackburn testified at trial that the City went "through
a series of meetings . . . relating to cost analysis for tap fees, [such as] committee meetings, hearing
from different staff, [and] that type of process." Black asserts, however, that the evidence shows
"that the challenged tap fees for multi-family dwellings were not based on the actual cost of
connecting a building to the City's water and sewer systems and setting up an account . . . ." He
further contends that the City did not perform a rate analysis until "years after the challenged tap fees
had been set" and that the eventual analysis "was not the basis for the fees." Black also relies on the
testimony of his expert witness, Bruce Fairchild, who concluded that the tap fees were unreasonable. 
Although Black asserts that the evidence he presented satisfied his burden of proof, his contention
ignores the trial court's role, as fact finder, to assess each of the witnesses' credibility and
conclusions in light of all the evidence. See Turner v. KTRK TV, Inc., 38 S.W.3d 103, 134 (Tex.
2000) (Baker, J., concurring in part, dissenting in part) ( "Under established Texas jurisprudence,
a reviewing court must defer to the fact-finder's credibility determinations because the [fact finder]
is the exclusive judge of the facts, the witnesses' credibility, and the weight given to their
testimony.") (citing Benoit v. Wilson, 239 S.W.2d 792, 796 (Tex. 1951)). That the trial court did not
agree with Black or his expert does not mean it erred. The record includes evidence that, in addition
to the City's direct connection costs, the district court considered factors such as the City's cost of
updating, improving, and maintaining its utility system. Thus, we cannot conclude that the district
court erred in applying Bartonville.

 Black next contends that the City's tap fees are unreasonable because they do not bear
a substantial relationship to the cost involved in connecting his buildings to the utility system. It is
well established that a utility's final rate must relate to its actual cost of providing the charged-for
service. Suburban Util Corp., 652 S.W.2d at 362; see also Charles F. Phillips, Jr., The Regulation
of Public Utilities, Theory and Practice 301 (1988) ("There has always been general agreement that
the price for the service of a public utility should be high enough to cover operating expenses,
depreciation, and taxes, and also allow a fair return on the fair value of the capital invested in the
business."). Typically, a utility operating on a cash basis, like the City, classifies its costs according
to its expenses associated with customer service, use, meter reading, billing, accounting and
collection expenses. John Baur, Effective Regulation of Public Utilities 39 (1925); see also Niles
v. Chicago, 558 N.E.2d 1324, 1332 (Ill. App. Ct. 1990) ("Cash basis accounting determines basic
revenue requirements by adding up operation and maintenance expense, debt service requirements,
and capital expenditures that are not debt financed."); Phillips, supra, at 766 (explaining revenue
determined on a cash basis method includes "operating and maintenance expenses, debt service,
payment in lieu of taxes, and plant extension, replacements, and improvements"). To meet his
burden of establishing that the City's tap fee ordinance is unreasonable based on the City's cost of
providing utility services, Black must show, not that the City's fees exceed its actual costs of
connecting his buildings to the utility system, but that the fees bear no relationship to the City's
expenses in providing him such services.

 At trial, Fairchild testified that


a fair and reasonable rate is regarded as one that approximates the cost of providing
the service. And the City has admitted that the [$]1179 is the approximate cost of
installing a two-inch water meter, and the $300 is the approximate cost of installing
a sewer tap, and Mr. Black in both 1998 and 2000 was charged well in excess of that
cost of providing the service that he received; therefore, those are unreasonable tap
fees.


This assertion erroneously defines the cost of service as merely the cost to the City of providing
Black the physical connections to its water and sewer systems. But experts for both parties
acknowledged that tap fees may include the City's direct and indirect costs associated with providing
water and sewer connections. Black agrees that, at a minimum, the "service provided to a landowner
is a physical connection of the new customer to the water and sewer system [and] also includes the
administrative act of setting up an account for billing and services purposes." Black's evidence,
however, establishes only that the City's actual cost of physically connecting a customer to its utility
system with a two-inch tap is approximately $1179; he adduced no evidence regarding the City's
indirect costs.

 Instead of showing the City's cost of service, Black attempts to satisfy his burden by
arguing that the tap fees are unreasonable because the City admits to including operation and
maintenance costs in both its monthly rates and tap fees: "According to Fairchild, those costs should
be recovered by the City through its monthly water and services charges, not through its tap fees." 
Black does not establish, however, that such a practice is impermissible or that the City is actually
recovering more than its costs of providing Black utility services. Without showing that the City's
tap fees bear no relationship to the City's cost of service as defined above, Black cannot satisfy his
burden of establishing that the tap fees are unreasonable. The trial court found that the City set its
tap fees "with due regard for [its] anticipated needs to improve, update, construct, and maintain the
system." This conclusion is supported by the evidence.

 City Manager Blackburn testified at trial and in deposition that, although the City did
not perform an "independent outside cost-of-service study," it "decided to institute [the] per-living-unit fee . . . because the demands on the City water and sewer system . . . and the continuing demand
for maintaining and operating the system for multi-family buildings causes a greater demand on the
system." While there is ample testimony concerning general ratemaking principles and speculative
City practices, there is no evidence to controvert Blackburn's testimony. Further, it is undisputed
that the City may recover costs related to servicing demands. Without establishing a direct
connection between the City's actual costs and assessed fees, Black could not show that the City's
tap fees are unreasonable. Neither Black's nor Fairchild's conclusory statements and conjecture are
sufficient to establish this link and satisfy Black's onerous burden. In the absence of evidence that
the City actually assesses tap fees in excess of its total service costs, we hold that the record supports
the trial court's findings that the City properly set its tap fees and that they are not unreasonable as
they related to the City's cost of providing Black utility services.

 Black's final argument regarding the unreasonableness of the City's tap fees asserts
that the magnitude of the tap fee increase, combined with a comparison of rates charged by other
similar utilities in the region, shows that the City's tap fees are unreasonable. (6) Black testified that
the tap fees for his 1998 and 2000 buildings increased over 1000% from those assessed on his three
buildings built before the 1997 amendment took effect. He also explained that, based on his survey
of other regions, the City's tap fees were disproportionately high. Although this circumstantial
evidence shows that the City's tap fees are higher than other regions, such evidence is not
determinative in deciding whether the City's tap fees are unreasonable. See Bartonville, 678 S.W.2d
at 300.

 While we recognize that concrete evidence may be difficult to procure, we are limited
by the standard of review to determining whether Black established by competent evidence that the
City's tap fees are in fact unreasonable, i.e., they bear no relationship to its costs of providing utility
services. Simply showing that tap fees increased and/or are greater (even if significantly so) than
other regions falls far short of the proof required to prevail. Without some evidence of the City's
actual expenses for providing utility service (per the standards set forth above), it necessarily follows
that Black cannot carry the substantial burden of establishing the unreasonableness of tap fees. We
hold that neither the evidence regarding the magnitude of the increase nor of the differential between
other regions' tap fees is sufficient to establish that the City's tap fees are unreasonable. Having
rejected each of Black's contentions regarding the reasonableness of the City's tap fees, we overrule
his first point of error.


Impact Fee

 Black next argues that the tap fees assessed by the City constitute impermissible
impact fees. (7) This is so, Black argues, because the tap fees assessed by the City exceed its cost of
providing utility service, and the City uses those excess funds to expand its water and waste
facilities. (8) The City acknowledged, in response to a request for admission, that the actual costs for
physically connecting a building to the water tap is $1179 for a two-inch tap (the same size that
services Black's buildings). The City asserts, however, that because it does not use any funds
collected as tap fees to fund new development, its tap fees are not impact fees.

 An ordinance assessing impact fees is invalid unless it complies with the procedures
outlined in Texas Local Government Code chapter 395. See Tex. Loc. Gov't Code Ann. §§ 395.011-.013, .041-.058 (West 1999 & Supp. 2002). A fee is not an impact fee merely because it is greater
than the actual cost associated with the service for which it is assessed. See Bartonville, 678 S.W.2d
at 299. Instead, the fee must impose upon a new development the burden of generating "revenue for
funding or recouping the costs of capital improvements or facility expansions necessitated by and
attributable to the new development." Tex. Loc. Gov't Code Ann. § 395.001(4) (West Supp. 2002). 
Thus, to prevail Black must establish that the City uses revenue generated from its tap fees to fund
expansion of the utility service to serve new development.

 Black's expert witness testified at trial regarding his opinion about whether the
challenged tap fees are effectively impact fees. Fairchild stated:


It's my opinion that the $300 fee for each additional water connection and the $300
fee for each additional sewer connection, both of which are charged based on the
number of living units, not on the number of taps, are effectively impact fees. That
even though they're called tap fees they have all the characteristics of an impact fee
because they are essentially assessed above the costs of providing the tap and they are
on a living unit equivalent basis which is how impact fees are typically assessed.



Explaining further, Fairchild testified:



Well, there's two other items that suggest that they are more akin to impact fees than
they are to tap fees. One of those is when they are assessed . . . . [T]ap fees are
normally assessed at the time the tap is actually made; whereas impact fees are . . .
more often [assessed] early in the process, either at when you get a building permit
or something prior to actual installation. Secondly, the history . . . of where the
earlier ordinance adopting this set of tap fees had the moneys from tap fees
specifically designated to go into an extension fund or a fund that was intended to
finance extensions of the Killeen water and sewer system.


Fairchild further testified that his conclusion--that the City's tap fees are impact fees--found
support from the fact that various annual budgets and records of municipal services provided
"evidence that revenue from the tap fees [was] being used by the City to . . . pay for capital
improvements and facility expansions." Fairchild's principal support for this argument came from
the fact "that Water and Sewer Tapped Revenues are included in the total revenues of the system. 
In other words, they're deposited in the Water and Sewer Fund. And out of that same fund . . .
capital improvement projects are also funded from the Water and Sewer Fund."

 Fairchild's testimony distills into the following arguments: the tap fees are in
actuality impact fees because (i) they are assessed above the cost of providing the tap connection,
(ii) they are assessed before the tap is actually made, (iii) earlier versions of the ordinance required
the tap fee revenues to be deposited in an account designated to fund extensions of the City's water
and sewer system, and (iv) the revenue derived from the tap fees is currently deposited into a general
Water and Sewer Fund which also funds capital improvement projects (new development
extensions). The City contends that a fee is not an impact fee unless it generates revenue for funding
or recouping the costs of new development. See Tex. Loc. Gov't Code Ann. § 395.001(4). At trial,
Fairchild defined impact fees as "dollars to be used for capital improvements." It appears that the
parties agree, as do we, that unless the revenues generated from tap fees are actually used for capital
improvements, they are not impact fees. The dispositive inquiry, then, concerns how the fees are
ultimately used, as opposed to how or when they are calculated or collected. For this reason, only
Fairchild's last two arguments are relevant to our determination of whether the City's tap fees are
impact fees.

 The trial court determined that the City "uses the revenue generated by water and
sewer tap fees 'to maintain and operate the system with due regard for anticipated needs to improve,
update, construct, and maintain the [utility] system.'" Although Black and Fairchild argue that the
City's actions prior to the 1997 amendment to the tap fee ordinance are evidence of its intent to raise
revenue for the expansion of the utility infrastructure made necessary by new development, they
offer no evidence of how the tap fees were spent during the relevant time period. We acknowledge
the difficulty of tracing the tap fees after they are deposited in the general Water and Sewer Fund,
but we cannot relieve Black of his burden of showing that funds are actually being used to pay for
expansion due to new development. Further, this burden cannot be satisfied by reference to the
City's past practices; nor is it sufficient for Black to allege that the "record includes evidence that
the City may use tap fee revenue to pay for capital improvements and facility expansion." (Emphasis
added.)

 At trial, Black made no attempt to show directly how the City funded facility
expansion. The City's Director of Finance, Connie Green, testified in deposition that "[t]he City
uses a consolidated cash account [so that] . . . transactions that affect each individual fund are
accounted for separately . . . and can be easily identified." Green further stated that: generally all
City appropriations are made in the budget; a project funded during the budgeting process will
receive a number code; each department submits payment requisitions with the predetermined code;
and the finance department, using the predetermined codes, processes the transactions and charges
them to the appropriate departments. Neither party called Green as a witness at trial. Despite the
apparent availability of City records concerning facility expansion costs, Black failed to establish
the City's actual practice of funding new development. City Manager Blackburn's testimony
regarding the general practice of the City's funding new development is alone insufficient to
establish that the City uses tap fee funds for new development expansion. (9)

 Because the record contains no analysis of the City's total costs of providing service
or the source of funding for new development expansion, we cannot disagree with the trial court's
finding of fact that the City "does not use tap fees to fund the costs of capital improvements or
facility expansion necessitated by and attributable to new development." Accordingly, we hold that
Black failed to meet his burden of establishing that the City's tap fees are impermissible impact fees. 
We overrule his fourth point of error.


Price Discrimination

 Black next contends that the City's tap fees are discriminatory "because they do not
relate to the level of service provided to each" multi-family building. This is so, according to Black,
because "even though the tap fee is applied uniformly across the multi-family customer class,
relative to the service that [is] provided, one customer pays more for the same service than another
customer." At the outset, we recognize that not all price discrimination is condemned, but only
"discrimination that is arbitrary and without a reasonable fact basis or justification." Caldwell v. City
of Abilene, 260 S.W.2d 712, 715 (Tex. Civ. App.--Eastland 1953, writ ref'd); see also Wiggins, 246
S.W.2d at 624 (stating that a utility service "may not discriminate in charges or service as between
persons similarly situated . . . unless there is some reasonable basis for a differentiation"); City of
Galveston v. Kenner, 240 S.W. 894, 895 (Tex. 1922) (explaining that utility "service must be given
without discrimination between persons similarly situated or under circumstances substantially the
same"). To be sure, public utilities are under a legal duty to charge reasonable rates and ensure that
they are not unduly discriminatory. (10) James C. Bonbright et al., Principles of Public Utility Rates
515 (2d ed. 1998). It is well established, however, that municipalities have the right to classify
customers "based upon such factors as the cost of service, the purpose for which the service or
product is received, the quantity or amount received, the different character of the service furnished,
the time of its use or any other matter which presents a substantial difference as a ground of
distinction." Gillam v. City of Fort Worth, 287 S.W.2d 494, 497 (Tex. Civ. App.--Fort Worth 1956,
writ ref'd n.r.e.). But in classifying its customers, municipalities "may not discriminate in charges
or services as between those similarly situated." Wiggins, 246 S.W.2d at 625. No rule of thumb
exists for determining whether customers are similarly situated. Ford v. Rio Grande Valley Gas Co.,
174 S.W.2d 479, 480 (Tex. 1943). The question of discrimination is one of fact and must be decided
on a case-by-case basis, recognizing that


[w]hether differences in rates between classes of customers are to be made, and, if
so, the amount of the differences, are legislative rather than judicial questions, and
are for the determination of the governing bodies of the municipalities. The
presumption is in favor of the legality of the rates established by the rate-making
authority, and courts may interfere only in clear cases of illegality.



Gillam, 287 S.W.2d at 497. The burden of proof remains at all times upon the party claiming a fee
is unreasonably discriminatory. (11) Caldwell, 260 S.W.2d at 714; Ford, 174 S.W.2d at 480.

 Black argues that the tap fees are discriminatory because only multi-family customer
tap fee charges include operating and maintenance expenses for the entire utility system; thus, "tap
fees for single family dwellings recover only the approximate cost of making the connection, while
the tap fees for multi-family dwellings are far in excess of the cost of installation of the tap." The
City's position is that per living unit assessments are permissible and nondiscriminatory. The City
argues that Black's contentions do not take into account that "it would be nearly impossible to devise
a system that perfectly correlated rates assessed to the number of persons using the system" and that
the City, "in its discretion, has determined that assessing tap fees on a per 'living unit' basis
reasonably recognizes costs associated with [the] increased demand" that multi-family buildings
place on the system. We agree with the statement of our sister court in a similar case involving a
challenge to an ordinance requiring some water customers to pay higher rates than others: "The
interest and needs of the numerous water users served by a city are such that it is improbable, if not
impossible, that any classification or rate basis could be devised which would not in some way
discriminate against some users." Caldwell, 260 S.W.2d at 715.

 The City was well within its authority to set its tap fees. It was Black's burden to
show that the City's tap fee structure assessed different rates for different classes of customers and
that such a "distinction [was] not justified by the difference in factors properly" considered by the
City in establishing the rate structure. Gillam, 287 S.W.2d at 497. Black asserts that, because the
City's monthly water rates account for operations and maintenance costs, the City cannot also
include those costs in assessing its tap fees. The City ordinance assesses tap fees based upon one
of five classifications: (i) residence (one connection charge); (ii) multi-family (one connection charge
for each living unit); (iii) commercial (one connection charge for each certificate of occupancy issued
or meter, whichever is greater); (iv) industrial (as authorized by city council); and (v) mobile home
park and manufactured home subdivisions (one connection charge for each living unit). Killeen,
Tex., Code of Ordinances § 30-102(b). On its face, the ordinance permits the City to assess each
occupant of a building a connection charge; that there are more occupants in multi-family dwellings
and commercial properties does not make the tap fee structure per se discriminatory. Black points
to no evidence in the record to support his position that the City is prohibited from recouping a
portion of its operation and maintenance costs through its tap fees. Thus, on the record before us,
we cannot say the trial court erred in finding that Black failed to establish that the City's tap fees are
unduly discriminatory, that is, that the City's reasons for discriminating were not justified by
reasonable bases. Accordingly, we overrule Black's second issue.

Attorney's Fees

 Black's fifth point of error challenges the trial court's denial of his request for
attorney's fees. Under the Uniform Declaratory Judgments Act, a trial court may award attorney's
fees "as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West Supp. 2002);
Brainard v. State, 12 S.W.3d 6, 27 (Tex. 1999). When a trial court denies claims for attorney's fees
under the Act, its decision is reviewed for an abuse of discretion. See Bocquet v. Herring, 972
S.W.2d 19, 21 (Tex. 1998). Whether a party prevails in a declaratory judgment action is not a
determining factor in awarding attorney's fees. See Commissioners Court v. Agan, 940 S.W.2d 77,
82 (Tex. 1997); Barshop v. Medina County Underground Water Conservation Dist., 925 S.W.2d
618, 637 (Tex. 1996). Because Black presents no evidence on appeal that the trial court abused its
discretion, we overrule his fifth point of error and affirm the trial court's judgment denying his
request for attorney's fees.


CONCLUSION

 Black failed to establish that the City's tap fees are unreasonable because there is no
evidence that such fees are in excess of the City's cost of providing utility services. Further, without
proof of the City's actual expenditures, Black failed to show that the City impermissibly uses tap fees
to fund new development and is thus an impact fee. Finally, because Black did not establish that the
City lacks a reasonable basis to classify customers differently, he also failed to establish that the tap
fees are discriminatory. Black did not carry his substantial burden of establishing that the City's tap
fee ordinance is invalid. Thus, we cannot say that the trial court's judgment in the City's favor is
incorrect. Accordingly, we overrule Black's five points of error and affirm the trial court's
judgment.



 

 Jan P. Patterson, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed: May 31, 2002

Publish
1.    "Tap fees" are assessed by the City to cover the costs of connecting a customer to the
City's water and sewer system.
2.    For the apartment buildings built in 1986, 1989, and 1994, Black paid only for a water
tap and a sewer tap connection. He paid: (i) $1000 for a water tap and $35 for a sewer tap in 1986;
(ii) $1000 for a water tap and $35 for a sewer tap in 1989; and (iii) $1072 for a water tap and $200
for a sewer tap in 1994.
3.    In 1997, the City amended its ordinance to assess tap fees based upon one of five possible
classifications. Killeen, Tex., Code of Ordinances § 30-102(b). For multi-family dwellings, i.e.,
apartment complexes, the City began charging a connection (tap) fee "for each living unit," as
opposed to each building connection, as it had done prior to 1997. See id. § 30-102(b)(2).
4.    Because Black did not assert the taxation argument in the court below, he waives the
issue on appeal. See Tex. R. App. P. 33.1(a).
5.    Although Suburban Utility Corp. v. Public Utility Commission involves a Public Utility
Commission order instead of a municipal ordinance, and it relates to rates determined under the
utility basis method, as opposed to the cash basis method, it is instructive for the general principle
that a municipal utility cannot arbitrarily set its rates. See 652 S.W.2d 358 (Tex. 1983).
6.    In his brief, Black states, "While these factors alone may not prove that the tap fees are
unreasonable, when considered in conjunction with the analysis of the evidence [of the district
court's misapplication of Bartonville and the fact that the fees do not relate to the City's cost of
service], all of these factors in combination make the tap fees per se unreasonable." Having rejected
Black's arguments regarding Bartonville and the City's cost of service, we analyze whether the
magnitude of the increase and rate differential between other regions alone are sufficient to show the
City's tap fees are unreasonable.
7.    An impact fee is


 a charge or assessment imposed by a political subdivision against new
development in order to generate revenue for funding or recouping the costs of
capital improvements or facility expansions necessitated by and attributable to
the new development. The term includes amortized charges, lump-sum charges,
capital recovery fees, contributions in aid of construction, and any other fee that
functions as described by this definition.


Tex. Loc. Gov't Code Ann. § 395.001(4) (West Supp. 2002).
8.    Having already addressed Black's argument regarding the City's cost of service in
providing tap connections, we limit our discussion here to determining only whether the City uses
tap fee revenues to fund new development.
9.    Black adduced testimony from Blackburn that capital improvements and facility
expansion are paid for by issuing revenue bonds and that the City does not pay those expenses from
its operating account. Black's expert testified that this practice--depositing revenues generated from
the City's tap fees into the general Water and Sewer Fund--is typical of municipalities.
10.    Price discrimination is assessed against a two-pronged test: (i) reasonableness of rates
and (ii) whether the rates are unduly discriminatory. James C. Bonbright et al., Principles of Public
Utility Rates 515 (2d ed. 1998). Discrimination "occurs when a seller establishes for the same
product or service different rates which are not entirely justified by differences in cost, or the same
rate where difference in cost would justify differences in price." Charles F. Phillips, Jr., The
Regulation of Public Utilities, Theory and Practice 62 (1988). The two bases for price
differentiation are "cost of service" and "value of service." Id. at 411. When rates are based upon
demand, impermissible discrimination occurs; however, "[a] seller does not [unduly] discriminate
when rates are based upon costs, even though some customers pay more than others." Id. at 411. 
Price discrimination is permitted because it may be more expensive to serve some customers than
others. Id. at 411-12. Accordingly, we recognize that discrimination may reflect policy
considerations on the part of the utility to limit the demands of certain customers on its resources.
11.    In arguing that he should prevail because the City "failed to meet its burden of showing
that [its] discrimination was reasonable and justified[,]" Black improperly assigns his burden to the
City. Black's assertion "that the record is completely devoid of any evidence . . . that the City
considered [any] factors in calculating [its] rates and establishing the tap fee methodology for multi-family tap fees" also confuses the burden of proof. The burden to establish that the tap fees are
unduly discriminatory rests with Black and cannot be satisfied by reference to what evidence the City
failed to produce. See Ford v. Rio Grande Valley Gas Co., 174 S.W.2d 479, 480 (Tex. 1943).