# IN THE SUPREME COURT OF TEXAS

════════════

No. 15-0005

════════════

ONCOR ELECTRIC DELIVERY COMPANY LLC, ET AL., PETITIONERS,

v.

PUBLIC UTILITY COMMISSION OF TEXAS, ET AL., RESPONDENTS

═══════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════════════════════════════════════════════════

**Argued September 13, 2016**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

On January 1, 2002, the Public Utilities Regulatory Act (PURA) implemented a competitive retail market for electricity in the Electric Reliability Council of Texas (ERCOT).[1] Each incumbent, vertically integrated electric utility within the market was required to "unbundle" its business

---

[1] *See* TEX. UTIL. CODE §§ 39.001(b)(1) ("The legislature finds that it is in the public interest to . . . implement on January 1, 2002, a competitive retail electric market that allows each retail customer to choose the customer's provider of electricity and that encourages full and fair competition among all providers of electricity"), 39.051(b) (providing for unbundling by January 1, 2002), 39.102(a) (providing for retail customer choice on or after January 1, 2002); *see also id.* § 31.002(5) ("'Electric Reliability Council of Texas' or 'ERCOT' means the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state."). ERCOT manages about 90% of the state's electric load, supplying power to some 24 million Texas customers. Outside ERCOT, Texas retail customers are served by cooperatives or vertically integrated investor-owned electric utilities subject to regulation; the Public Utility Commission has not certified that any of those areas have met PURA's competitive critieria. PUB. UTIL. COMM'N OF TEX., REPORT TO THE 84TH LEGISLATURE: SCOPE OF COMPETITION IN ELECTRIC MARKETS IN TEXAS 19, 44 n.20, 52–53 (Jan. 2015), http://www.puc.texas.gov/industry/electric/reports/scope/2015/2015scope_elec.pdf.

activities into three separate units[2]: a power generation company,[3] a transmission and distribution utility (TDU),[4] and a retail electric provider (REP).[5] Of the three, only TDUs continued to be regulated by the Public Utilities Commission (PUC).[6]

In this case, several parties to a TDU ratemaking proceeding seek judicial review of the PUC's order. As the case comes to us, only three issues remain. We hold that:

- PURA Section 36.351,[7] which requires electric utilities to discount charges for service provided to state college and university facilities, does not apply to TDUs because they provide service to REPs, not to the REPs' customers;

- former PURA Section 36.060(a),[8] which required an electric utility's income taxes to be computed as though it had filed a consolidated return with a group of its affiliates eligible

---

[2] TEX. UTIL. CODE § 39.051(b); *see In re TXU Elec. Co.*, 67 S.W.3d 130, 132 (Tex. 2001) (per curiam).

[3] TEX. UTIL. CODE § 31.002(10) ("'Power generation company' means a person . . . that: (A) generates electricity that is intended to be sold at wholesale . . . ; (B) does not own a transmission or distribution facility in this state . . . ; and (C) does not have a certificated service area . . . .").

[4] *Id.* § 31.002(19) ("'Transmission and distribution utility' means a person . . . that owns or operates for compensation in this state equipment or facilities to transmit or distribute electricity . . . .").

[5] *Id.* § 33.001(17) ("'Retail electric provider' means a person that sells electric energy to retail customers in this state. A retail electric provider may not own or operate generation assets.").

[6] *Id.* § 31.002(6) (defining "electric utility" to mean a person that "owns or operates for compensation in this state equipment to produce, generate, transmit, distribute, sell or furnish electricity in this state"—thus including TDUs—but expressly excluding, in (G) and (H), power generation companies and REPs); *see also id.* §§ 32.001(a) (establishing the PUC's original jurisdiction "over the rates, operations and services of an electric utility"), and 36.001 (providing authority to "establish and regulate rates of an electric utility" and adopt related rules).

[7] *Id.* § 36.351.

[8] Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 774 [SB 1751] (nonsubstantively recodifying, *inter alia*, former TEX. REV. CIV. STAT. ANN. art. 1446c-0, § 2.208(c)). Section 36.060(a) was rewritten in 2013. *See* Act of May 20, 2013, 83d Leg., R.S., ch. 787, § 1, 2013 Tex. Gen. Laws 2003 [SB 1364] ("If an expense is allowed to be included in utility rates or an investment is included in the utility rate base, the related income tax benefit must be included in the computation of income tax expense to reduce the rates. If an expense is not allowed to be included in utility rates or an investment is not included in the utility rate base, the related income tax benefit may not be included in the computation of income tax expense to reduce the rates. The income tax expense shall be computed using the statutory income tax rates.").

to do so under federal tax law, did not require a utility to adopt a corporate structure so as to be part of the group; and

•        the evidence here establishes that franchise charges negotiated by the TDU with various municipalities were reasonable and necessary operating expenses under PURA § 33.008.[9]

We affirm the judgment of the court of appeals[10] in part and reverse it in part, and remand the case to the PUC for proceedings consistent with this opinion.

## I

Oncor Electric Delivery Co., LLC ("Oncor") is the largest TDU in Texas and the sixth largest in the United States. Its 14,600 miles of transmission lines and 102,000 miles of distribution lines cover 53,300 square miles and reach 7 million consumers in 401 cities and 91 counties within ERCOT. Before deregulation, Oncor's system was part of TXU Electric Co., an integrated utility.

Oncor is regulated by the PUC. In June 2008, Oncor initiated a ratemaking proceeding with the Commission, its first request for a comprehensive rate increase since deregulation. Oncor requested a $253 million increase because of the large investment it had made in its system, its mounting operations costs, and its anticipated need to make capital expenditures. Several parties intervened. After extensive hearings, the administrative law judges recommended only a $30 million rate increase. The PUC ultimately approved a $115 million increase.

Oncor and other parties to the administrative proceeding sued for judicial review and then appealed to the court of appeals. The disputes have been winnowed to three, and we limit our discussion to them. The PUC concluded that:

---

[9] TEX. UTIL. CODE § 33.008.

[10] 450 S.W.3d 615 (Tex. App.—Austin 2014).

- PURA does not require Oncor to discount its rates for transmitting and distributing electricity purchased by state colleges and universities;

- PURA does not require that Oncor's federal income tax expense be calculated as if it had filed a consolidated return with its affiliates, and the expense should be determined as if Oncor were a stand-alone corporation; and

- Oncor failed to show that certain municipal franchise charges were reasonable and necessary expenses.

The trial court agreed with the PUC on the tax issue but disagreed on the other two. The court of appeals agreed with the PUC on the discount and franchise fee issues but not on the tax issue.[11]

Three petitions for review were filed with this Court:

- The State of Texas, which has universities in Oncor's service areas, seeks review of the appellate court's resolution of the discount issue. The State's petition is opposed by Oncor, the PUC, and CenterPoint Energy Houston Electric, LLC, another TDU. Eight state universities in CenterPoint's service area filed an amicus brief in support of the State's petition.[12] We refer to the State and its amici as "State Universities".[13]

---

[11] *Id.* at 662, 630–631, 654, 659, 665.

[12] Amici curiae are the University of Texas MD Anderson Cancer Center at Houston, the University of Texas Health Science Center at Houston, the University of Texas Medical Branch at Galveston, the University of Houston System, Texas A&M University at Galveston, Texas A&M Health Science Center-Institute of Biosciences & Technology, Texas Engineering Extension Service at Galveston, and Prairie View A&M Nursing School.

[13] The governments of the State are unusually divided in this case. The State sued for judicial review in the trial court in its own name, asserting the consumer interest of its institutions of higher education in the statutory discount. The State also has an interest in utility ratemaking through its agency, the PUC, which concluded that Oncor is not required to apply the discount to its rates. The State and the PUC, with their conflicting positions, are both represented by the Attorney General. The State has since adopted the alias, "State of Texas Agencies and Institutions of Higher Education", shortened to "State Agencies", apparently to more clearly distinguish between the State's conflicting interests as both consumer and regulator. But that agnomen suggests that state agencies other than educational institutions have an interest in the discount, which, as we explain below, is incorrect. Nor is the State's consumer interest different from the interest of the amici State Universities. We think the State and its amici are more clearly designated "State Universities", by which we mean all entities claiming the statutory discount.

4

- Oncor seeks review of the appellate court's resolution of the tax issue. Oncor's petition is opposed by the Office of Public Utility Counsel (OPUC);[14] municipalities within Oncor's service area, which refer to themselves as "The Steering Committee of Cities Served by Oncor" ("Cities"); and the Texas Industrial Energy Consumers (TIEC).

- Oncor and Cities seek review of the appellate court's resolution of the franchise fee issue. Their petition is opposed by the PUC.

The issues, rulings, and parties' positions are summarized in this scorecard:

| Issue | PUC | TC | CA | PFR | Respondent |
|---|---|---|---|---|---|
| Must Oncor discount its rates to state universities? | No | Yes | No | State | Oncor PUC CenterPoint |
| Must Oncor's income tax expense be calculated as if it filed a consolidated return with affiliates? | No | No | Yes | Oncor[15] | OPUC Cities TIEC |
| Are franchise fees paid by Oncor reasonable & necessary? | No | Yes | No | Oncor Cities | PUC |

We granted all three petitions.[16] We address the issues in the order listed.

## II

With exceptions not relevant here, PURA Section 36.351 requires an electric utility to "discount charges for electric service provided to a facility of a four-year state university, upper-level

---

[14] OPUC is an agency created by statute to represent the interests of residential and small commercial consumers. TEX. UTIL. CODE §§ 13.001, .003.

[15] The PUC did not file a petition for review. Though the PUC asserts that it properly interpreted the statute, its response argued that the Court need not grant review on this issue because the statute has since been amended.

[16] 59 Tex. Sup. Ct. J. 359 (Feb. 19, 2016).

institution, Texas State Technical College, or college."[17] Under the statute, "[t]he discount is a 20-percent reduction of the utility's base rates that would otherwise be paid under the applicable tariffed rate."[18]

Section 36.351 was enacted in 1995,[19] when, as we noted at the outset, the generation, transmission, distribution, and sale of electricity were vertically integrated operations of single utilities fully regulated by the PUC. In 1999, the Legislature passed Senate Bill 7[20] "to establish competition in the retail market for electricity beginning January 1, 2002, and 'to protect the public interest during the transition' to competition."[21] Senate Bill 7 unbundled vertically integrated utilities in ERCOT, mandating that each electric utility separate its business activities into a power generation company, an REP, and a TDU.[22] The statute deregulated power generation companies and REPs, creating "a competitive retail electric market that allows each retail consumer to choose the customer's provider of electricity".[23] But TDUs remained fully regulated by the PUC.[24] Under

---

[17] TEX. UTIL. CODE § 36.351(a).

[18] *Id.* § 36.351(b).

[19] Act of May 27, 1995, 74th Leg., R.S., ch. 765, § 2.20, 1995 Tex. Gen. Laws 3972, 4007 [SB 373], codified as TEX. REV. CIV. STAT. ANN. art. 1446c-0, § 2.2141, recodified in 1997 as TEX. UTIL. CODE § 36.351, Act of May 8, 1997, 75th Leg., R.S. ch. 166, §§ 1, 9, 1997 Tex. Gen. Laws 713, 784, 1018 [SB 1751].

[20] Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543 [SB 7].

[21] *In re TXU Elec. Co.*, 67 S.W.3d 130, 132 (Tex. 2001) (Phillips, C.J., concurring) (quoting TEX. UTIL. CODE § 39.001(a)).

[22] Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2559 [SB 7] (codified as TEX. UTIL. CODE § 39.051(b)).

[23] *Id.* at 2558 [SB 7] (codified as TEX. UTIL. CODE § 39.001(b)).

[24] TEX. UTIL. CODE § 39.001(a).

deregulation, TDUs still deliver electricity directly to the retail consumer's meter and provide metering services, but the charges for TDUs' services are paid by REPs, which in turn charge the consumer.[25]

Senate Bill 7 did not change the text of Section 36.351, but it did redefine "electric utility" to exclude unbundled power generation companies and REPs, thereby removing them from the discount requirement.[26] Section 63 of Senate Bill 7 suspended this change during the transition to a competitive market, freezing total rates paid for electricity by state universities covered by Section 36.351 at December 31, 2001 levels until September 1, 2007.[27]

When Oncor initiated this ratemaking proceeding in June 2008, Section 63's freeze had expired. Oncor contended that the Section 36.351 discount no longer applied to it because it did not,

---

[25] TEX. UTIL. CODE § 39.107(a) ("On introduction of customer choice in a service area, metering services for the area shall continue to be provided by the transmission and distribution utility . . . ."), (d) ("Beginning on the date of introduction of customer choice in a service area, a transmission and distribution utility, or an electric cooperative or municipally owned utility providing the customer's energy requirements shall bill a customer's retail electric provider for nonbypassable delivery charges as determined under Section 39.201. The retail electric provider or the electric cooperative or municipally owned utility, as appropriate, must pay these charges."). The Administrative Code explains that "[o]n the introduction of customer choice in a service area, metering services . . . for the area shall continue to be provided by the transmission and distribution utility affiliate . . . of the electric utility that was serving the area before the introduction of customer choice". 16 TEX. ADMIN. CODE § 25.346(g)(2).

[26] Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 11, 1999 Tex. Gen. Laws 2543, 2548 [SB 7] (amending TEX. UTIL. CODE § 31.002(6)).

[27] Section 63 of Senate Bill 7 provided:

Notwithstanding any other provision of this Act or Title 2, Utilities Code, any person or entity that provides electric service to a four-year state university, upper-level institution, Texas state technical college, or college, as provided by Section 36.351, Utilities Code, on December 31, 2001, shall continue to offer electric service to a four-year state university, upper-level institution, Texas state technical college, or college, as provided by Section 36.351, Utilities Code, until September 1, 2007, at a total rate that is no higher than the rate applicable to the university, institution, or college on December 31, 2001.

Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 63, 1999 Tex. Gen. Laws 2543, 2625 [SB 7] (uncodified).

in the statute's words, "charge[] for electric service provided to a facility" of any retail customer, including state universities. Oncor argued that only REPs provide electric service to retail customers. The State Universities opposed Oncor's position. The PUC agreed with Oncor. Concluding that Section 36.351 is ambiguous, the court of appeals deferred to the PUC's interpretation.[28]

We do not agree that Section 36.351 is ambiguous. PURA is quite clear: in deregulated areas of the state, a TDU "may not sell electricity";[29] only REPs can.[30] TDUs cannot charge consumers for electric service; TDUs charge wholesale tariffed rates set by the PUC to REPs, who in turn charge customers negotiated, competitive retail rates. It follows that TDUs cannot discount rates to consumers but only to REPs. But Section 36.351 does not require a discount to REPs. The State Universities acknowledge that an REP may not have a legal obligation to pass along a TDU's discount to consumers but stress that as a practical matter, universities negotiate with REPs for a straight pass-through of the TDU charges without any mark-up. The point remains that if universities continue to receive a discount, it is because of negotiation, not because of Section 36.351. REPs'

---

[28] 450 S.W.3d 615, 629 (Tex. App.—Austin 2014). *See Thompson v. Tex. Dep't of Licensing & Regulation*, 455 S.W.3d 569, 571 (Tex. 2014) ("We defer to agency interpretations of statutes only if they are ambiguous, provided that the agency's interpretation is reasonable and does not conflict with the plain language of the statute."); *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624–625 (Tex. 2011) (summarizing the case law on giving "some deference" or "serious consideration" to an agency's interpretation of a statute, and concluding that the Court would uphold the Commission's interpretation if it was reasonable and in accord with the plain language of the statute).

[29] TEX. UTIL. CODE § 39.105(a).

[30] *Id.* § 39.352(a) ("After the date of customer choice, a person, including an affiliate of an electric utility, may not provide retail electric service in this state unless the person is certified by the commission as a retail electric provider, in accordance with this section.").

lack of any obligation to pass along TDU discounts to consumers further illustrates that TDUs do not charge consumers for electric service.

Nor do TDUs provide electric service to consumers. The State Universities argue that TDUs' transmission and distribution of electricity to consumers' service meters is a provision of electric service to consumers' facilities under Section 36.351 because TDUs' lines connect to meters installed and maintained by TDUs at each retail consumer's facilities. But while TDUs do provide electric service[31]—the physical delivery of electricity to consumers' premises—they provide this service to REPs. Only REPs can access the electricity delivered by TDUs. Consumers obtain electricity through the service provided by REPs.

The State Universities argue that to interpret Section 36.351 as not applying to TDUs in deregulated areas produces an absurd result: a state university facility in a regulated area of the state —outside ERCOT, where vertically integrated electric utilities still exist and are subject to Section 36.351—would be entitled to a discount, while a facility in ERCOT would not be. The University of Texas at El Paso would receive the discount; the University of Texas at Arlington would not. But we agree with Oncor and the PUC that leaving any discount to negotiation is consistent with the competitive market under deregulation.

The PUC argues that the Legislature recognized the Section 36.351 discount would not survive deregulation and enacted Section 63 of Senate Bill 7 to extend its effect while the market transitioned to competition. The State Universities counter that Section 63 froze the total rates paid

---

[31] *Id*. § 11.003(19) ("'Service' has its broadest and most inclusive meaning. The term includes any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties . . . to its patrons, employees, other public utilities, an electric cooperative, and the public.").

9

by state universities, not merely the discount. But the discount was included in the frozen rates. Section 63 preserved the discount while capping total rates. Indeed, Section 63 repeatedly referenced Section 36.351. We think the PUC has the better of the argument.[32]

Finally, the State Universities point to PURA Section 36.354 as evidence that Section 36.351 applies to TDUs. Section 36.354 requires electric utilities to discount rates to military bases but only "in an area where customer choice is not available."[33] Thus, the statute does not apply to TDUs. The State Universities argue that when the Legislature wanted to exclude TDUs from a discount provision, it did so explicitly, and no corresponding language appears in Section 36.351. But in 1995, when Section 36.351 was enacted, it was clearly intended to apply to integrated utilities, including their transmission and distribution operations. Senate Bill 7's change in the definition of "electric utility" made Section 36.351, as we have interpreted the provision, inapplicable to TDUs but for Section 63, which expired by its own terms in 2007. No change in Section 36.351's text was needed to remove its application to TDUs. Section 36.354 was not enacted until 2003.[34] At that point, the limitation of its application to areas outside ERCOT, still under regulation, was perfectly consistent with Section 36.351.

---

[32] The State Universities argue that the PUC's current position is inconsistent with its determination in a 2001 ratemaking case that the TDU was required to discount its rates under Section 36.351. *See* Pub. Util. Comm'n of Tex., *Application of Cent. Power & Light Co. for Approval of Unbundled Cost of Serv. Rate Pursuant to PURA § 39.201 & Pub. Util. Comm'n Substantive Rule § 25.344*, Docket No. 22352, Order (Oct. 5, 2001). But when the PUC decided that case, Section 63 was still in effect.

[33] TEX. UTIL. CODE § 36.354(a).

[34] Act of May 15, 2003, 78th Leg., R.S., ch. 149, § 21, 2003 Tex. Gen. Laws 209, 222–223 [SB 652)], amended by Act of May 23, 2013, 83d Leg., R.S., ch. 1217, § 3.23, 2013 Tex. Gen. Laws 3032, 3071 [SB 1536] (amending TEX. UTIL. CODE § 36.354(g)).

We agree with the PUC that Section 36.351 does not apply to TDUs in deregulated areas.

## III

The PUC was required to determine Oncor's projected expenses and set rates[35] at a level that would allow Oncor a reasonable return on its investment.[36] One expense was Oncor's future tax liability.[37] Oncor contended that its tax expense should be determined as if it were a separate corporation. OPUC, Cities, and TIEC argued that Oncor's tax liability should be calculated as if it were included in its parent's consolidated tax return. The PUC agreed with Oncor. The court of appeals reversed.[38]

Filing a consolidated federal income tax return allows affiliated companies to share losses and thereby lower their collective tax liability.[39] PURA Section 36.060 requires that the tax savings from filing a consolidated return benefit ratepayers.[40] At the time Oncor's ratemaking proceeding was pending in the PUC, Section 36.060(a) provided in pertinent part:

> Unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns, an electric utility's income taxes shall be

---

[35] *See State v. Pub. Util. Comm'n*, 883 S.W.2d 190, 198–199 (Tex. 1994) ("Fundamental in the utility ratemaking process is the principle that utility rates are set for the future, and not the past.").

[36] TEX. UTIL. CODE § 36.051.

[37] *Pub. Util. Comm'n v. GTE-Sw., Inc.*, 901 S.W.2d 401, 411 (Tex. 1995) ("The income tax calculation is no different than other elements of utility ratemaking.").

[38] 450 S.W.3d 615, 629 (Tex. App.—Austin 2014).

[39] *See* 26 U.S.C. §§ 1501, 1503, 1552; 26 C.F.R. § 1.1502–11.

[40] *See Cities of Corpus Christi v. Pub. Util. Comm'n*, No. 03-06-00585-CV, 2008 WL 615417, at *9 (Tex. App.—Austin Mar. 5, 2008, no pet.) (mem. op.) ("Because the potential for substantial savings exists when a corporation files a consolidated tax return, section 36.060 of the PURA requires the Commission to consider such savings when setting a utility's rates.").

11

computed as though a consolidated return had been filed and the utility had realized its fair share of the savings resulting from that return, if:

(1)     the utility is a member of an affiliated group eligible to file a consolidated income tax return; and

(2)     it is advantageous to the utility to do so.[41]

Oncor argues that it does not meet condition (1).

Under federal tax law, a parent corporation and certain of its subsidiary corporations are an affiliated group that is allowed to file a consolidated return.[42] When Oncor initiated this proceeding in June 2008, it was a wholly owned subsidiary of Energy Future Holdings Corporation (EFH).[43] In 2007, EFH and its affiliates, including Oncor, filed a consolidated tax return, as EFH's and Oncor's predecessors had done for years. Oncor, because it was wholly owned by EFH, was deemed a "disregarded" entity and treated as a division of EFH under federal tax law.[44] Had Oncor filed separately, its tax liability would have been $151 million, but EFH's affiliated group shared

---

[41] Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 774 [SB 1751], amended by Act of May 20, 2013, 83d Leg., R.S., ch. 787, § 1, 2013 Tex. Gen. Laws 2003 [SB 1364]. All further references to Section 36.060 are to the 1997 version of the statute.

[42] 26 U.S.C. § 1504(a)(1) ("The term 'affiliated group' means– (A) 1 or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation, but only if– (B)(i) the common parent owns directly stock meeting the requirements of paragraph (2) in at least 1 of the other includible corporations, and (ii) stock meeting the requirements of paragraph (2) in each of the includible corporations (except the common parent) is owned directly by 1 or more of the other includible corporations."), (2) ("The ownership of stock of any corporation meets the requirements of this paragraph if it– (A) possesses at least 80 percent of the total voting power of the stock of such corporation, and (B) has a value equal to at least 80 percent of the total value of the stock of such corporation."); see also 26 C.F.R. § 1.1502–1(a), (b), and (h) (consolidated return regulations defining "group", "member", and "consolidated group").

[43] Before October 2007, Oncor's predecessor, Texas Utilities (TXU) Electric Delivery Company, was a Texas corporation wholly owned by EFH's predecessor, TXU Corporation. In October 2007, Oncor became a Delaware limited liability corporation.

[44] See 26 C.F.R. § 301.7701-2(a) ("A business entity with only one owner is classified as a corporation or is disregarded; if the entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner.").

operating losses and, as a result, paid no taxes.[45] Using 2007 as the test year, and applying Section 36.060(a), Oncor's projected tax expense was much lower.

But in November 2008, while this proceeding was still pending in the PUC, EFH sold a 19.96% interest in Oncor to two international investors. At that point, Oncor was a "partnership" for federal tax purposes,[46] and, because it no longer had a single owner, could not be "'disregarded' as an entity separate from its owner."[47] Federal tax law permitted Oncor to elect to be treated as a corporation,[48] which would have allowed Oncor to be included in the affiliated group eligible for EFH's consolidated tax return.[49] But Oncor did not make that election, and so by default it would

---

[45] Oncor did pay EFH $151 million under their tax-sharing agreement, which called for a consolidated federal income tax filing for all EFH's affiliates and subsidiaries, but specifically "segregated or ring-fenced" Oncor from the tax liabilities or benefits of EFH's affiliates. The agreement provided that, beginning January 1, 2007, Oncor's income tax liability would be calculated and paid on a stand-alone basis as if Oncor were a corporation unrelated to EFH and its affiliates. This agreement, of course, does not control the application of Section 36.060.

[46] *See* 26 C.F.R. § 301.7701-2(c)(1) ("For federal tax purposes . . . [t]he term *partnership* means a business entity that is not a corporation under paragraph (b) of this section and that has at least two members." (emphasis in original)).

[47] *See id.* § 301.7701-2(c)(2) ("Except as otherwise provided in this paragraph (c), a business entity that has a single owner and is not a corporation under paragraph (b) of this section is disregarded as an entity separate from its owner.").

[48] *See id.* §§ 301.7701-2(a) ("A business entity with two or more members is classified for federal tax purposes as either a corporation or a partnership."), (b)(2) ("For federal tax purposes, the term *corporation* means . . . [a]n association (as determined under § 301.7701-3)" (emphasis in original)); *see also id.* § 301.7701-3(a) ("A business entity that is not classified as a corporation [under certain regulations] (an *eligible entity*) can elect its classification for federal tax purposes as provided in this section. An eligible entity with at least two members can elect to be classified as either an association (and thus a corporation under § 301.7701-2(b)(2)) or a partnership, and an eligible entity with a single owner can elect to be classified as an association or to be disregarded as an entity separate from its owner." (emphasis in original)), and (b)(1) ("Except as provided in paragraph (b)(3) of this section [recognizing pre-existing classifications], unless the entity elects otherwise, a domestic eligible entity is — (i) A partnership if it has two or more members; or (ii) Disregarded as an entity separate from its owner if it has a single owner.").

[49] *See* 26 U.S.C. § 1504(a)(2) ("80-percent voting and value test").

13

be taxed as a partnership and could not be included in EFH's consolidated tax return.[50] The change

did not impact EFH financially. EFH included its income as a partner in Oncor in its consolidated

tax return, offset this income with other losses, and realized the same sort of tax savings as before.

The PUC determined that:

- Oncor's tax expense should not be based on 2007 but on its situation after November 2008;

- after November 2008, Oncor was no longer a member of a group eligible to file a consolidated tax return within the meaning of Section 36.060(a), and therefore that statute did not require calculating its tax return as though it were still included in EFH's consolidated tax return; and

- although Oncor would be taxed as a partnership, its tax expense should be calculated as if it were a stand-alone corporation.

The court of appeals held that because Oncor could have elected to be taxed as a corporation, and

there was no impediment to its doing so, it remained a member of an affiliated group eligible to file

a consolidated tax return.[51] Therefore, the court concluded, the PUC should have used the 2007 test

year and applied Section 34.060(a).[52]

We disagree. Section 36.060(a) very plainly applies only to a utility that "*is*" a member of

an affiliated group eligible to file a consolidated tax return, not a utility that *could be*. The court of

appeals was troubled that Oncor could use its change of ownership and federal tax law to give EFH

the savings ratepayers had received when Oncor was included, as a "disregarded" entity, on EFH's

consolidated tax return. But that concern cannot be used to read Section 36.060(a) contrary to its

---

[50] *See id.* §§ 1501, 1504.

[51] 450 S.W.3d 615, 654 (Tex. App.—Austin 2014).

[52] *Id.*

plain text. TIEC argues that the statute should apply because Oncor was "eligible" to be part of a group filing a consolidated tax return. But that misreads the provision. It is the group that must be eligible to file a consolidated return, not the utility. The utility must be a member of an eligible group, and after November 2008, Oncor was not.[53]

The developments of November 2008 were "known and measurable changes" the PUC was required to take into account,[54] and it correctly interpreted Section 36.060(a). OPUC, Cities, and TIEC nevertheless argue that the PUC erred in calculating Oncor's tax expense as if it were a corporation when it is taxed as a partnership—that is, its income is passed through to its owners, who bear the tax. For that reason, they insist, Oncor's tax expense is minimal. We rejected this argument in *Suburban Utility Corp. v. Public Utility Commission of Texas*.[55] There, we held that a utility structured as a Subchapter S corporation could include, as reasonable and necessary expenses in a ratemaking proceeding, the income taxes paid by its shareholders on the utility's taxable income.[56] Citing precedent from the Commission, we explained that income taxes paid by shareholders of a pass-through entity "are inescapable business outlays and are directly comparable with similar corporate taxes which would have been imposed if the utility operations had been carried on by a corporation."[57] Fairness "entitled" the owner of a pass-through entity "to a reasonable cost of service

---

[53] Section 36.060 has been changed, and how it would now apply is not an issue in the case.

[54] *See* 16 TEX. ADMIN. CODE § 25.231(b) ("In computing an electric utility's allowable expenses, only the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered . . . .").

[55] 652 S.W.2d 358 (Tex. 1983).

[56] *Id*. at 363–364.

[57] *Id*. at 364.

15

allowance for federal income taxes actually paid by its shareholders on [its] taxable income or for

taxes it would be required to pay as a conventional corporation, whichever is less."[58]

The PUC's determination to calculate Oncor's tax expense as if it were a corporation was

not arbitrary or capricious.[59]

## IV

Municipalities franchise to utilities the use of streets, alleys, and other public areas. PURA

states that it "does not restrict the rights and powers of a municipality to grant or refuse a franchise

to use the streets and alleys in the municipality or to make a statutory charge for that use."[60] But

Senate Bill 7 added PURA Section 33.008, which addresses franchise charges. As related to this

case:

- Subsection (a) recognizes that a municipality may impose a reasonable franchise charge on a TDU under competition.[61]

---

[58] *Id.* We later clarified that the Commission is not bound by the taxes actually paid because the statute allowed the Commission discretion in determining the utility's "fair share" of tax savings from actual or hypothetical consolidated tax returns, and in weighing potential future tax expenses from future income. *Pub. Util. Comm'n v. GTE-Sw., Inc.*, 901 S.W.2d 401, 410–411 (Tex. 1995).

[59] TEX. GOV'T CODE § 2001.174(2)(F); *State v. Public Utility Comm'n*, 344 S.W.3d 349, 356 (Tex. 2011); *Gulf States Utilities Co. v. Public Utility Comm'n*, 947 S.W.2d 887, 890 (Tex. 1997).

[60] TEX. UTIL. CODE § 14.008(a).

[61] Section 33.008(a) of the Texas Utilities Code states:

Following the end of the freeze period for a municipality that has been served by an electric utility, and following the date a municipally owned utility or an electric cooperative has implemented customer choice for a municipality that has been served by that municipally owned utility or electric cooperative, a municipality may impose on an electric utility, transmission and distribution utility, municipally owned utility, or electric cooperative, as appropriate, that provides distribution service within the municipality a reasonable charge as specified in Subsection (b) for the use of a municipal street, alley, or public way to deliver electricity to a retail customer. A municipality may not impose a charge on:

16

- Subsection (b) allows a municipality that imposed franchise charges before competition to continue to charge per kilowatt hour of electricity delivered within the municipality the average such charge imposed in 1998.[62]

- Subsection (c) provides that such charges are reasonable and necessary operating expenses of the utility and may be passed on to REPs.[63]

---

     (1) an electric utility, or transmission and distribution utility, municipally owned utility, or electric cooperative for electric service provided outside the municipality;
     (2) a qualifying facility;
     (3) an exempt wholesale generator;
     (4) a power marketer;
     (5) a retail electric provider;
     (6) a power generation company;
     (7) a person that generates electricity on and after January 1, 2002; or
     (8) an aggregator, as that term is defined by Section 39.353.

The "freeze period" ended when competition began. *Id.* § 31.002(8) ("'Freeze period' means the period beginning on January 1, 1999, and ending on December 31, 2001.").

[62] Section 33.008(b) states:

     If a municipality collected a charge or fee for a franchise to use a municipal street, alley, or public way from an electric utility, a municipally owned utility, or an electric cooperative before the end of the freeze period, the municipality, after the end of the freeze period or after implementation of customer choice by the municipally owned utility or electric cooperative, as appropriate, is entitled to collect from each electric utility, transmission and distribution utility, municipally owned utility, or electric cooperative that uses the municipality's streets, alleys, or public ways to provide distribution service a charge based on each kilowatt hour of electricity delivered by the utility to each retail customer whose consuming facility's point of delivery is located within the municipality's boundaries. The charge imposed shall be equal to the total electric franchise fee revenue due the municipality from electric utilities, municipally owned utilities, or electric cooperatives, as appropriate, for calendar year 1998 divided by the total kilowatt hours delivered during 1998 by the applicable electric utility, municipally owned utility, or electric cooperative to retail customers whose consuming facilities' points of delivery were located within the municipality's boundaries. The compensation a municipality may collect from each electric utility, transmission and distribution utility, municipally owned utility, or electric cooperative providing distribution service shall be equal to the charge per kilowatt hour determined for 1998 multiplied times the number of kilowatt hours delivered within the municipality's boundaries.

[63] Section 33.008(c) states:

     The municipal franchise charges authorized by this section shall be considered a reasonable and necessary operating expense of each electric utility, transmission and distribution utility, municipally owned utility, or electric cooperative that is subject to a charge under this section. The charge shall be included in the nonbypassable delivery charges that a customer's retail electric provider must pay under Section 39.107 to the utility serving the customer.

17

- Subsection (f) states:

     Notwithstanding any other provision of this section, on the expiration of a franchise agreement existing on September 1, 1999, an electric utility, transmission and distribution utility, municipally owned utility, or electric cooperative and a municipality may mutually agree to a different level of compensation or to a different method for determining the amount the municipality may charge for the use of a municipal street, alley, or public way in connection with the delivery of electricity at retail within the municipality.[64]

Section 62(a) of Senate Bill 7 added: "Nothing in this Act shall restrict or limit a municipality's historical right to control and receive reasonable compensation for use of public streets, alleys, rights-of-way, or other public property to convey or provide electricity."

In its application to the PUC, Oncor proposed to include $253,884,976 of municipal franchise charges as a reasonable and necessary operating expense. Of this amount, almost $5.7 million was a 5% increase recently negotiated between Oncor and Cities. The PUC rejected Oncor's request, concluding that a utility cannot pay more than the charge set out in Section 33.008(b). In the court of appeals, the PUC abandoned that position, which is directly contradicted by Section 33.008(f)'s phrase, "[n]otwithstanding any other provision". Instead, the PUC argued, citing the language in subsection (f), that Oncor could include in its expenses a charge described in Section 33.008(f) only if it proved that the charge was agreed to "on the expiration of a franchise agreement existing on September 1, 1999".[65] The PUC argued that Oncor failed to meet its burden of proof because there was less than a scintilla of evidence that Oncor had agreements with the Cities before September 1,

---

[64] *Id.* § 33.008(f).

[65] 450 S.W.3d 615, 658–659 (Tex. App.—Austin 2014).

and that these agreements expired thereafter. The court of appeals agreed.[66]

But the expiration of a franchise agreement existing on September 1, 1999, cannot be read as a condition to agreeing to a different charge. If it were, a municipality that had no franchise agreement with a TDU on that date could never impose a franchise charge in the future. A municipality with a franchise agreement in effect on that date could renegotiate it only once and never again afterward. These restrictions would severely limit "a municipality's historical right to control and receive reasonable compensation" for the use of public property, in direct contradiction of Section 62(a) of Senate Bill 7.

Section 33.008(f) does not restrict renegotiated franchise charges to *only* those agreed to on the expiration of franchise agreements existing on September 1, 1999. The provision simply precludes the inference that Section 33.008(b) is exclusive. Reading the paragraphs of Section 33.008 together, as we must, they confirm that municipalities may continue to impose franchise charges after competition, that charges per kilowatt hour equal to the average amount charged in 1998 must be considered reasonable and necessary, and that utilities may continue to renegotiate franchise charges, though they must demonstrate that the charges are reasonable and necessary in order to pass them along to REPs.

The court of appeals misinterpreted Section 33.008(f). The PUC's disallowance of Oncor's renegotiated franchise charges was error.

---

[66] *Id.*

\*     \*     \*     \*     \*

Accordingly, the judgment of the court of appeals is affirmed in part and reversed in part, and the case is remanded to the PUC for proceedings consistent with this opinion.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: January 6, 2017

20