# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00063-CV

**The City of Killeen, Appellant**

**v.**

**Oncor Electric Delivery Company LLC, Appellee**

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 23-DCV-336513, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

## O P I N I O N

This appeal arises out of appellee Oncor Electric Delivery Company LLC's suit seeking a declaratory judgment and injunctive relief to prevent appellant the City of Killeen from condemning the streetlight system that Oncor operates in the City. Oncor contends that the City lacks constitutional authority to condemn the streetlight system, and thus, the City's taking of the system by condemnation would violate the Texas Constitution. *See* Tex. Const. art. I, § 17. The City filed a plea to the jurisdiction, arguing that the trial court lacks subject-matter jurisdiction over the suit on the bases of ripeness and governmental immunity. After the trial court denied the City's plea to the jurisdiction, the City filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8). For the reasons discussed below, we conclude that Oncor's claims are ripe and that the City's governmental immunity is waived for Oncor's claims for equitable relief because Oncor has pleaded a viable claim that the City's proposed taking violates the Texas Constitution. Therefore, we affirm the trial court's denial of the City's plea to the jurisdiction.

## BACKGROUND

**Oncor Is a Regulated Utility**

Oncor is the largest electric transmission-and-distribution utility (TDU) in Texas. *Oncor Elec. Delivery Co. LLC v. Public Util. Comm'n of Tex.*, 507 S.W.3d 706, 709 (Tex. 2017). Oncor is regulated by the Public Utility Commission of Texas (PUC). *Id.* at 710. After the Texas Legislature enacted legislation to establish a competitive retail market for electricity, the incumbent vertically integrated electric utilities were required to unbundle their "business activities into three separate units: a power generation company, a transmission and distribution utility (TDU), and a retail electric provider (REP)." *Id.* at 708-09 (footnotes omitted). Oncor, as a TDU, "own[s] the former[ly] [integrated] utility's wires and deliver[s] power over them for others as a rate-regulated monopoly, but [is] restricted from owning generation assets or buying or selling electricity themselves." *AEP Tex. Com. & Indus. Retail Ltd. P'ship v. Public Util. Comm'n of Tex.*, 436 S.W.3d 890, 895 (Tex. App.—Austin 2014, no pet.).

The Public Utility Regulatory Act (PURA), Tex. Util. Code §§ 11.001-66.016, requires Oncor to provide continuous and adequate service to all customers in its certificated service area. *Id.* § 37.151. According to its petition, as a TDU, Oncor constructs, operates, and maintains a system of electric facilities across the state that includes "wires, utility poles, transformers, substations, and more." Oncor's certificated area includes the City of Killeen, and it is the City's only TDU. *See id.* § 37.051(b). As the TDU for the City, Oncor delivers electricity directly to the retail consumers' meters and provides metering services, but the charges for Oncor's services are paid by retail electric providers, which in turn charge the consumer. *See Oncor*, 507 S.W.3d at 712.

2

**Oncor's Tariff Covers the City's Streetlight System**

As part of the PUC's regulation of Oncor's transmission rates and services, Oncor is required to file with the PUC a tariff showing each rate for a utility service, product, or commodity offered by Oncor (the "Tariff"). Tex. Util. Code § 32.101. The approved tariff has the binding force of law and governs Oncor's relationship with its customers. *CenterPoint Energy Res. Corp. v. Ramirez*, 640 S.W.3d 205, 212 (Tex. 2022) ("An approved tariff carries the binding force and effect of law until suspended or set aside and, while in effect, defines the terms under which the utility's services are provided."); *CenterPoint Energy Entex v. Railroad Comm'n of Tex.*, 208 S.W.3d 608, 621 (Tex. App.—Austin 2006, pet. dism'd) ("[F]iled tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside."). "By approving the tariff, the [PUC] . . . fixed the terms and conditions under which the utility's services are provided." *Ramirez*, 640 S.W.3d at 217.

Oncor owns and operates streetlights in many cities, including the City of Killeen. The streetlight system that Oncor owns and operates in the City consists of approximately 4,600 streetlights ("Streetlight System"). The Streetlight System is connected to the power lines that Oncor operates as part of its electric-distribution facilities. The Streetlight System includes various fixtures, such as poles, streetlight arms, lamps, and wiring. About 2,200 streetlights (approximately half of the system) are co-located on poles with other types of Oncor's distribution facilities.

Oncor's Tariff includes, among other things, rates and service obligations for streetlights. The Tariff imposes specific obligations on Oncor to repair and maintain the Streetlight System. These obligations include making repairs within 15 calendar days of a repair request, removing lights at a customer's request, and maintaining all facilities incidental to providing

3

streetlight service. Oncor's Tariff also contains a form agreement for streetlighting service that further governs the terms of its provision of that service. Under that agreement, the charges associated with Oncor's provision of streetlight service are included on the bill or invoice that the city receives from its designated competitive retailer.

The Tariff also prohibits Oncor from owning, operating, and maintaining any facilities behind the customer's "Point of Delivery," which is defined as "[t]he point at which Electric Power and Energy leaves the Delivery System." The Tariff defines the "Retail Customer's Electrical Installation" as all equipment "of any kind on Retail Customer's side of the Point of Delivery except the Meter and Metering Equipment, used by or on behalf of Retail Customer in taking and consuming Electric Power and Energy delivered by Company." "Retail Customer is responsible for the design, installation, operation, protection and maintenance of electric facilities beyond the Point of Delivery, and [Oncor] shall have no responsibility therefore[.]"

The PUC periodically reviews Oncor's Tariff. The most recent review of the Tariff was a comprehensive base rate case filed in May 2022. *See Application of Oncor Electric Delivery Company LLC for Authority to Change Rates*, PUC Docket No. 53601-1 (filed May 13, 2022). The City intervened and participated in the rate case as a member of the Steering Committee of Cities Served by Oncor. The administrative trial in the rate case occurred in September to October 2022, and the State Office of Administrative Hearings Administrative Law Judges issued a Proposal for Decision on December 28, 2022. The PUC issued an order approving revisions to Oncor's Tariff on April 6, 2023, and an order on rehearing on June 30, 2023. The City did not raise any relevant issues relating to Oncor's rates, services, or operations relating to the Streetlight System in this Tariff review case even though it had begun exploring the possibility of taking over the Streetlight System before the rate case commenced.

4

**The City Takes Steps to Condemn the Streetlight System**

In 2021, the City hired a third-party consultant, Tanko Streetlighting, Inc., to investigate the costs and benefits of a plan by which the City would obtain ownership of the Streetlight System and take over operations of Oncor's streetlight business. After receiving Tanko's report and appraisal of the value of the Streetlight System in May 2021, the City began the process under the Property Code to condemn Oncor's Streetlight System in 2022.

At a meeting on February 15, 2022, the City Council unanimously voted to send an offer to purchase the Streetlight System. On December 2, 2022, the City sent Oncor an Initial Offer Letter, stating that "[t]he City is vested with the authority of eminent domain under Chapter 251 of the Texas Local Government Code and by its home-rule charter" and that "the City, as a condemning authority, is required to follow certain procedural requirements" under Chapter 21 of the Property Code. The City stated that it seeks to acquire "the streetlight system currently owned by Oncor," specifically "all streetlights located on any type of pole within the boundaries of the City," including "the streetlight fixture, the arm, base (if applicable), any and all wiring above the ground feeding the streetlight from Oncor and the pole (if a standalone pole)." The Initial Offer Letter enclosed Tanko's appraisal report. *See* Tex. Prop. Code § 21.011(a) (requiring disclosure of any appraisal reports when an offer is made to purchase or lease property by "[a]n entity with eminent domain authority that wants to acquire real property for a public use"). The City informed Oncor that the letter served as the initial offer letter required by Chapter 21 of the Property Code.

The Initial Offer Letter identified the 4,539 streetlights valued by Tanko and proposed to purchase them for $701,110. The letter requested that Oncor respond to the offer no later than January 1, 2023, after which the offer was to be deemed withdrawn. The Initial Offer Letter stated that the offer was conditional and subject to the City's final review and approval by

5

the City Council, among other things, and that "nothing in this letter is intended to pre-commit the City to any particular action with respect to the proposed acquisition of this Property." The Initial Offer Letter also stated, "It is necessary for the City to acquire this Property. Therefore, the City will proceed to file a condemnation suit under state law should an agreement not be reached."

The City next sent the Landowner's Bill of Rights to Oncor on December 23, 2022, with a cover letter indicating that the City sought to purchase the Streetlight System. It also stated, "This correspondence serves as the required submission and notice of the Landowner's Bill of Rights and has been provided at least seven (7) days prior to any potential Final Offer, as required by Chapter 21 of the Texas Property Code." *See id.* § 21.0112(a).

Then on January 3, 2023, the City sent Oncor a Final Offer seeking to purchase the Streetlight System under the same terms as the Initial Offer Letter had offered. The Final Offer identified the same 4,539 streetlights and offered the same $701,110 purchase price. The City included the same conveyance documents and appraisals that had been sent with the Initial Offer Letter. The City's Final Offer satisfied the Property Code's timing requirements for condemnation—it was submitted 30 days after the initial offer, *see id.* § 21.0113(b)(3), and it gave Oncor 14 days to respond, *see id.* § 21.0113(b)(7).

The City placed the condemnation proceeding on the City Council's agenda for its meeting exactly 14 days later, on January 17, 2023.

**Oncor Files this Suit in the Trial Court**

Oncor filed this lawsuit on January 13, 2023, before the 14-day deadline in the Final Offer and the Property Code expired. Oncor seeks declaratory and injunctive relief to prevent the City from initiating a condemnation proceeding. *See* Tex. Civ. Prac. & Rem. Code §§ 37.001-

6

.011, Uniform Declaratory Judgments Act (UDJA); *id.* §§ 65.001-.045. Oncor alleges that the City's attempt to condemn the Streetlight System is unconstitutional and illegal. It asserts that "[t]he City lacks the authority to condemn the Streetlight System because: (1) no Texas law provides a mechanism for the City to compensate Oncor for the value of its Streetlight System as a going concern, and thus the City's condemnation of the Streetlight System would violate the Texas Constitution; (2) the City's condemnation of the Streetlight System provides no public benefit and therefore the taking would violate the Texas Constitution; and (3) the paramount public importance doctrine precludes the City's taking."

Oncor sought a temporary restraining order (TRO) and temporary injunction to prevent the City from condemning the Streetlight System while Oncor's suit is pending. The trial court granted Oncor's TRO application after a hearing on January 20, 2023, restraining the City from filing a condemnation proceeding relating to the Streetlight System. The trial court set the hearing on the temporary injunction for February 17, 2023.

Also on January 20, 2023, the City filed its plea to the jurisdiction, arguing that the trial court lacked subject-matter jurisdiction because Oncor's claims are not ripe and because governmental immunity was not waived for Oncor's suit. The trial court signed the order denying the plea to the jurisdiction on February 3, 2023. It also extended the TRO through February 17, 2023, the date that the temporary-injunction hearing was set.

The City immediately filed its notice of interlocutory appeal on February 3, 2023. *See id.* The parties entered into a Rule 11 agreement under which the City agreed not to initiate condemnation proceedings for 60 days. After agreeing to several extensions of the agreement, when the agreement was set to lapse on June 13, 2023, the City declined to agree to a further extension. Consequently, Oncor filed an emergency motion for temporary relief in this Court in

7

early June 2023, requesting that we preserve the status quo by restraining the City from filing a condemnation proceeding relating to the Streetlight System during the pendency of this appeal. We granted the motion and ordered the City to be so restrained.

**STATUTORY FRAMEWORK**

Before turning to the issues raised by the City on appeal, we will provide some relevant background information about condemnation proceedings. Texas Local Government Code Section 251.001(a) provides that "[w]hen the governing body of a municipality considers it necessary, the municipality may exercise the right of eminent domain for a public use to acquire public or private property, whether located inside or outside the municipality, for any of" an enumerated list of public uses. "A municipality exercises its power of eminent domain through the process referred to as condemnation." *Villarreal v. Harris County*, 226 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2006, no pet.). "Condemnation is the procedure by which the sovereign exercises its right to take property of a private owner for public use, without consent, upon the payment of just compensation." *Id.*

"The eminent domain statute is designed to provide a speedy and fair assessment of damages." *Gulf Energy Pipeline Co. v. Garcia,* 884 S.W.2d 821, 823 (Tex. App.—San Antonio 1994, orig. proceeding); *see also In re State*, 85 S.W.3d 871, 876 (Tex. App.—Tyler 2002, orig. proceeding) (op. on reh'g). To achieve that goal, the Texas Legislature has established a two-part procedure for condemnation proceedings.

Under the Property Code, the first phase of a condemnation proceeding is an administrative proceeding; then, if necessary, a judicial proceeding follows. *Amason v. Natural Gas Pipeline Co.*, 682 S.W.2d 240, 241 (Tex. 1984). When a party with eminent-domain authority

8

desires to condemn land for public use but cannot agree on settlement terms with the property owner, the condemning party must file a petition in a proper court in the county in which the land is located. *Id.* (citing Tex. Prop. Code §§ 21.001, .003, .013); *see also* Tex. Prop. Code § 21.012 (establishing requirements for condemnation petition). After a petition is filed, the trial court appoints three special commissioners who "assess the damages of the owner of the property being condemned" after a properly noticed evidentiary hearing. Tex. Prop. Code §§ 21.014-.016, .042. The special commissioners "then file an award which, in their opinion, reflects the value of the sought-after land." *Amason*, 682 S.W.2d at 242. The special commissioners' power is limited to filing in the proper court an award of fair compensation for the condemnation—they have no power to determine any other issues, including whether the condemning party has the right to condemn the property. *Id.* ("[T]he Special Commissioners are powerless to decide whether the condemnor possesses the right to condemn the property in the first place.").

The administrative phase is designed to provide "a means to quickly award damages . . . without the delays that occur in court proceedings." *In re State*, 85 S.W.3d at 876; *see also PR Invs. v. State*, 251 S.W.3d 472, 478 (Tex. 2008) (explaining that administrative phase provides parties with opportunity to present their case in "a relatively streamlined fashion and to resolve their differences" without "the burdens of a trial"). The Texas Supreme Court has observed that "the parties often accept the commissioners' decision or settle their differences shortly after the award is made," bringing the eminent-domain proceedings "to a prompt and reasonably satisfactory conclusion with a minimum of expense and inconvenience to the parties." *State v. Nelson*, 334 S.W.2d 788, 791 (Tex. 1960). During this phase, the trial court only has "jurisdiction to appoint the commissioners, receive their opinion as to value, and render judgment based upon the commissioners' award," *Gulf Energy Pipeline Co.*, 884 S.W.2d at 822, and to

9

consider its own jurisdiction to appoint special commissioners, *In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 543-44 (Tex. 2016) (orig. proceeding). If the trial court abuses its discretion by acting outside its jurisdiction during this phase of the proceedings, mandamus relief is proper. *In re John G. & Marie Stella Kenedy Mem'l Found.*, 315 S.W.3d 519, 522 (Tex. 2010) (orig. proceeding); *see also Gulf Energy Pipeline Co.*, 884 S.W.2d at 824 (explaining that "[i]t is well settled that a court is not to enjoin or otherwise hinder or delay the special commissioners from proceeding with the condemnation hearing").

After the special commissioners file their award, if any party is dissatisfied with the commissioners' award, it may file objections to the commissioners' findings in the trial court, thus invoking the trial court's jurisdiction and initiating the judicial phase, which is the second phase of the condemnation proceeding. Tex. Prop. Code § 21.018; *see also Gulf Energy Pipeline Co.*, 884 S.W.2d at 823. Once timely objections have been filed and citation is served, the commissioners' award is vacated and may not be reinstated. *Amason*, 682 S.W.2d at 242; *In re State*, 85 S.W.3d at 877. The proceeding becomes a civil case, and the trial court has jurisdiction to determine all issues in the suit in a trial de novo. *Gulf Energy Pipeline Co.*, 884 S.W.2d at 823; *see also* Tex. Prop. Code § 21.018(b) (establishing that after objection, trial court shall cite adverse party and "try the case in the same manner as other civil causes"). Without a timely filed objection, an eminent-domain proceeding never becomes a civil case. *Gulf Energy Pipeline Co.*, 884 S.W.2d at 823; *see In re Lazy W Dist. No. 1*, 493 S.W.3d at 542 ("If no party timely files an objection to the award, the trial court adopts the commissioners' findings as the judgment of the court.").

Here, Oncor seeks to enjoin the City from initiating the condemnation proceeding because it asserts that the City lacks legal authority to bring the condemnation proceeding. It alleges that once the City obtains a special commissioners' award in the administrative phase of

10

the condemnation proceeding, under Section 21.021, the City would have the right to immediately take possession of the Streetlight System before the second phase of the condemnation proceedings began if it deposited the amount of the award in the registry of the trial court. *See* Tex. Prop. Code § 21.021. Oncor alleges that it would suffer irreparable harm from transferring possession of the Streetlight System to the City, "given the myriad operational impacts to the streetlight and distribution systems that would result." Oncor further alleges that even if a court later determined a transfer of possession to the City should not have occurred, "uncertainty would persist regarding how Oncor would accomplish re-obtaining possession of the Streetlight System following the operational impacts to Oncor's facilities that the City's taking would cause." In addition, Oncor alleges that the City's proposed taking jeopardizes Oncor's ability to comply with its statutory duty to provide continuous service to all customers in its certificated service area within the City as PURA requires, both because of the operational impacts arising from such a taking and because of "the Tariff restrictions that prohibit Oncor from owning facilities behind the individual points of delivery at issue—which would encompass each streetlight in the Streetlight System under the City's proposal."

## ANALYSIS

The City's plea to the jurisdiction challenged Oncor's pleadings, asserting that the trial court lacked subject-matter jurisdiction because the suit was not ripe and there is no legislative waiver of the City's governmental immunity for Oncor's suit. Whether Oncor has alleged facts that affirmatively demonstrate the trial court's subject-matter jurisdiction is a question of law that we review de novo. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Likewise, whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is also a question of law. *Id.* When a plea to the jurisdiction challenges the pleadings,

11

"we construe the pleadings liberally in favor of the plaintiff[]" and determine whether the pleadings, liberally construed, "allege[] facts that affirmatively demonstrate the court's jurisdiction." *Id.*

## I. Oncor's Claims Are Ripe

The City argues that Oncor's suit seeks an advisory opinion in a case that is not yet ripe. *See Patterson v. Planned Parenthood of Hous. & Se. Tex.*, 971 S.W.2d 439, 442 (Tex. 1998) ("The constitutional roots of justiciability doctrines such as ripeness, as well as standing and mootness, lie in the prohibition on advisory opinions, which in turn stems from the separation of powers doctrine."). Ripeness "is a threshold issue that implicates subject matter jurisdiction," and it "emphasizes the need for a concrete injury for a justiciable claim to be presented." *Id.* "Ripeness examines when that action may be brought." *Id.* When evaluating ripeness, we consider whether "the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Id.* "By focusing on whether the plaintiff has a concrete injury, the ripeness doctrine allows courts to avoid premature adjudication, and serves the constitutional interests in prohibiting advisory opinions." *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000). In a more recent case addressing ripeness, the Texas Supreme Court held that claims for declaratory and injunctive relief were ripe when litigation by the State against the plaintiffs was sufficiently likely to occur. *See Patel v. Texas Dep't of Licensing & Regul.*, 469 S.W.3d 69, 78 (Tex. 2015) (concluding that plaintiffs "were subject to a real threat of likely civil and criminal proceedings, as well as administrative proceedings that could result in penalties and sanctions," even though State had not yet begun administrative proceedings against them).

In this case, the City argues that Oncor's suit is not ripe because it depends on hypothetical or contingent facts, specifically, the outcome of a vote by the City Council to file a condemnation suit, which it asserts is required by Texas Local Government Code Section 251.001(b). *See* Tex. Loc. Gov't Code § 251.001(b) ("A municipality condemning land under this section may take a fee simple title to the property if the governing body expresses the intention to do so.").[1] The City also contends that what property would be condemned and what findings the City Council would make as to the necessity and purpose for condemnation are still unknown, hypothetical facts.[2] The City asserts that the case therefore is not ripe because it depends on "hypothetical events that have not come to pass." The City argues that Oncor's claim that the City lacks the necessary legal authority to condemn the Streetlight System may ripen if the City Council votes to file a condemnation proceeding and then initiates it. The City further argues that Oncor can assert its defense that the City lacks the necessary legal authority to condemn the Streetlight System only after such a proceeding is initiated. We disagree.

The City has taken every step required under the Property Code that is a prerequisite to filing a condemnation proceeding. As it followed each step, it informed Oncor that it was following the Chapter 21 procedural requirements for condemnation and that it intended to file a condemnation suit if the parties could not reach an agreement. First, on December 2, 2022, it made an initial offer to purchase the 4,539 streetlights valued by Tanko, proposing to purchase them for

---

[1] We note that by its express terms, Section 251.001(b) applies to the condemnation of land, not to either fixtures or an integrated system of fixtures like the Streetlight System. *See* Tex. Loc. Gov't Code § 251.001(b).

[2] We note that the City argues elsewhere in its brief that "[t]he public purpose of operation and cost-effective streetlights is obvious and well-established," citing, *e.g.*, *County of Cameron v. Brown*, 80 S.W.3d 549, 557 (Tex. 2002).

$701,110. That Initial Offer Letter stated, "It is necessary for the City to acquire this Property." It also disclosed the City's appraisal report as required by the Property Code. *See* Tex. Prop. Code § 21.011(a). Second, it provided the Landowner's Bill of Rights on December 23, 2022. *See id.* § 21.0112 (requiring provision of Landowner's Bill of Rights no later than seven days before final offer). Third, on January 3, 2023, the City made a Final Offer to purchase the 4,539 streetlights for $701,110, which satisfied the requirements under Property Code Section 21.0113 to be a bona fide offer. *See id.* § 21.0113 (requiring final offer be made on or after 30th day after initial offer and that property owner be provided with 14 days to respond).

The City had set the condemnation proceeding on the City Council's agenda for its meeting exactly 14 days later, on January 17, 2023. *See* Tex. Gov't Code § 2206.053 (requiring governmental entity to "authorize the initiation of the condemnation proceeding at a public meeting by a record vote" before initiating condemnation proceeding under Property Code Section 21.012). After a City Council vote to initiate a condemnation proceeding, the only step remaining was for the City to file a condemnation petition. *See* Tex. Prop. Code § 21.012 (establishing that "[i]f an entity with eminent domain authority wants to acquire real property for public use but is unable to agree with the owner of the property on the amount of damages, the entity may begin a condemnation proceeding by filing a petition in the proper court" and setting forth requirements for petition).

The City followed all the necessary statutory steps under Chapter 21 to file a condemnation petition and had informed Oncor multiple times of its intent to file a condemnation suit if an agreement for the City to purchase the Streetlight System could not be reached. The City was poised to take the vote required by Government Code Section 2206.053 and to file its Chapter

14

21 condemnation petition when Oncor filed its suit and application for a TRO.[3]  As explained above, once the City files a condemnation petition, the first phase of the condemnation proceeding would begin, and the City could potentially take possession of the Streetlight System before Oncor was ever able to present its argument to the trial court that the City's proposed taking is unconstitutional.  We conclude that Oncor's claims are ripe because it has shown a threat of litigation in the immediate future that could lead to the concrete injury of the loss of possession of the Streetlight System and the concomitant inability of Oncor to comply with its statutory duty under PURA and the operational difficulties that would occur during a transfer of possession.  This "threat of harm is more than conjectural, hypothetical, or remote."  *See Patel*, 469 S.W.3d at 78; *see also Perry v. Del Rio*, 66 S.W.3d 239, 253 (Tex. 2001) (stating that ripeness analysis "requires that we 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties

---

[3]  *But see Texas Mun. Power Agency v. Johnston*, 405 S.W.3d 776, 784 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (holding property owner's suit for injunctive relief against agency's entry onto his property and attempt to condemn land not ripe because agency's board had not voted to authorize initiation of condemnation proceeding).  Although the City urges us to follow our sister court's holding in *Johnston*, we do not find that case's pre-*Patel* analysis persuasive.  In addition, *Johnston* is factually distinguishable because the agency had not yet completed Chapter 21's statutory requirements for filing a condemnation proceeding.  *See id.* at 778-780.  Although the agency had sent Johnston an initial offer to purchase and an appraisal and a copy of the Landowners' Bill of Rights in January 2012, negotiations between the parties continued and the agency's counsel sent Johnston a letter requesting entry on the property to conduct surveys in April 2012, or a meeting to negotiate to do so, noting that "should TMPA elect to resort to legal proceedings," it would likely seek injunctive relief to enter the property in conjunction with its eminent-domain powers—not that it would file a condemnation suit.  This letter prompted Johnston to file his suit.  In contrast, here, the City completed every prerequisite to filing a Chapter 21 condemnation petition and put the matter on the City Council's agenda 14 days after sending its bona fide final offer.

of withholding court consideration'" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967))).[4]

We overrule the City's first issue.

## II.     The City's Immunity Is Waived for Oncor's Viable Constitutional Claim

In its second issue, the City contends that even if Oncor's suit is ripe, it is barred by the City's governmental immunity, and the district court therefore erred by denying the City's plea to the jurisdiction. The City makes three arguments in support of its contention that its immunity has not been waived. The City contends there has been no waiver of immunity because (1) Property Code Section 21.003 does not waive its immunity to Oncor's claims even though that Section waives immunity in certain cases; (2) the UDJA does not provide a general waiver of immunity, and Oncor does not challenge the validity of any statute or ordinance; and (3) Oncor has not pleaded an immunity waiver through an alleged violation of the Texas Constitution because it has identified no unconstitutional action that the City has taken.

Oncor asserts in response that the Texas Supreme Court has held that a city can be enjoined from a threatened unconstitutional condemnation. *See Lone Star Gas Co. v. City of Fort*

---

[4]  *See also Richardson v. Republic Title of Tex., Inc.*, No. 05-22-00026-CV, 2022 WL 17843594, at *3 (Tex. App.—Dallas Dec. 22, 2022, pet. denied) (mem. op.) (holding title company's suit against real-estate developer for declaratory judgment that deed had validly transferred ownership of property was ripe where petition's allegations and summary-judgment evidence were "indicative of threatened litigation in the immediate future with respect to the ownership of the Property and Republic Title's obligations under its policy"); *Cosmopolitan Condo. Owners Ass'n v. Class A Inv'rs Post Oak, LP*, No. 01-16-00769-CV, 2017 WL 1520448, at *5 (Tex. App.—Houston [1st Dist.] Apr. 27, 2017, pet. denied) (mem. op.) (concluding that evidence "manifested the presence of 'ripening seeds of a controversy'" sufficient to establish ripeness when homeowners' association sent a letter to a developer, contending that development agreement was "notably vague[,] indefinite and unenforceable," and that if developer did not change its position, parties would "certainly [end up] in the courthouse" (quoting *Texas Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 154 (Tex. App.—Austin 1998, no pet.))).

*Worth*, 98 S.W.2d 799, 801 (Tex. [Comm'n Op.] 1936) ("It is universally recognized that an attempt, or threatened attempt, to take private property for public use by virtue of eminent domain may be restrained by injunction when the proceeding is for any reason void."). It also argues that more modern cases confirm that the holding in *Lone Star Gas* remains good law. Oncor further contends that it has presented a viable constitutional claim that the City's threatened taking would be void because no appropriate procedure exists to ascertain and compensate it for the value of the Streetlight System as a "going concern," *see id.* at 803-05, and thus, the City's immunity is waived.

"Political subdivisions of the state, including cities, are entitled to immunity—referred to as governmental immunity—unless it has been waived." *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Governmental immunity "deprives a trial court of subject-matter jurisdiction." *Id.* (citing *Miranda*, 133 S.W.3d at 224). Courts "generally defer[] to the Legislature to waive immunity because the Legislature is better suited to address the conflicting policy issues involved." *Id.* at 375. Thus, when construing a particular statute to determine whether it waives governmental immunity, we consider whether a waiver has been established through "clear and unambiguous" language. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006); *see also* Tex. Gov't Code § 311.034. "However, [b]ecause sovereign immunity, and by extension governmental immunity, is first and foremost a common-law doctrine, the [Texas Supreme Court] ha[s] recognized that the judiciary is responsible for defining the doctrine's boundaries and determining whether it applies in the first instance." *Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 183 (Tex. 2023) (addressing whether governmental entity could assert sovereign immunity as defense to another governmental entity's suit against it).

A.    **Governmental Immunity Is Waived Under Chapter 21 for Issues Related to the Authority to Condemn Property**

We first address the City's contention that Property Code Section 21.003 does not apply to waive its immunity to Oncor's suit. Property Code Section 21.003, which is found in Subchapter A, Jurisdiction, of the eminent-domain chapter, establishes the following:

> A district court may determine all issues, *including the authority to condemn property* and the assessment of damages, in any suit:
>
> (1) in which this state, a political subdivision of this state, a person, an association of persons, or a corporation is a party; and
>
> (2) that involves a claim for property or for damages to property occupied by the party under the party's eminent domain authority or for an injunction to prevent the party from entering or using the property under the party's eminent domain authority.

Tex. Prop. Code § 21.003 (emphasis added).

The City argues that Section 21.003 "does not establish a separate basis for jurisdiction." It contends that Section 21.003 instead only grants "ancillary jurisdiction to determine issues" arising from a condemnor's eminent-domain authority, relying on *Doan v. TransCanada Keystone Pipeline, LP*, 542 S.W.3d 794, 803 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The City argues that because no condemnation proceeding has yet been filed, there is no condemnor, and thus, there can be no ancillary jurisdiction, so Section 21.003 is not a statutory waiver of the City's immunity.

We disagree with the conclusions that the City draws from *Doan*. In *Doan*, the court was considering whether to apply the general law found in Section 21.003, which provides jurisdiction to district courts, or a later, more specific statute granting exclusive jurisdiction over condemnation and takings claims in Harris County to the county civil courts at law. *Id.* at 800.

18

The court held that the later, more specific statute applied, meaning that the district court lacked jurisdiction over the condemnor's condemnation counterclaim that it brought in the condemnee's trespass suit. *Id.* at 801. No condemnation proceeding had been filed by the condemnor (who was the party arguing in favor of the district court's jurisdiction), but that was not the court's reason for not applying Section 21.003. *See id.* In the course of addressing the condemnor's arguments in support of the district court's jurisdiction, the court explained Section 21.003 and its interaction with Section 21.017(a). Section 21.017(a) allows a political subdivision that is a party to a suit covered by Section 21.003 "by petition, cross-bill, or plea in intervention [to] assert a claim to the property or, alternatively, seek to condemn the property."

In other words, Section 21.003 does not contemplate that *only* in suits that begin as condemnation proceedings does the district court have jurisdiction over "all issues, including the authority to condemn property," as the City argues. Instead,

> Texas Property Code Section 21.003 is the general rule granting a district court ancillary jurisdiction to determine issues such as condemnation of property in cases involving "*a claim for property* or for damages to property occupied by the party under the party's eminent domain authority *or for an injunction to prevent the party from entering or using the property under the party's eminent domain authority*." Tex. Prop. Code § 21.003. Thus, Texas Property Code section 21.017 allows a party to a suit that already is within the district court's ancillary jurisdiction under section 21.003 to raise a condemnation claim against another by petition, cross-bill, or plea of intervention.

*Id.* at 803 (emphases added). Accordingly, Chapter 21 expressly waives immunity and grants the district court jurisdiction to consider all issues, including the entity's condemnation authority, in suits brought against governmental entities for various property-related claims, such as inverse condemnation and trespass—not only in suits that begin as condemnation proceedings brought by an entity with eminent-domain authority. Here, Oncor's suit seeks declaratory and injunctive relief

19

from the City's threatened exercise of its eminent-domain authority to condemn Oncor's property. Because the City has invoked its eminent-domain authority by taking all the steps required under Chapter 21 for a condemnation suit, and Oncor's claims against the City's threatened exercise of that authority are ripe, we conclude that Chapter 21 waives governmental immunity for Oncor's equitable claims challenging the City's authority to condemn the Streetlight System.

This is an issue of first impression. Therefore, because of the unusual circumstances here, where the City seeks not to condemn real property, but an entire streetlight system currently owned and operated by a regulated utility company, we also address the parties' arguments about whether *Lone Star*'s holding that a governmental entity may be enjoined from a constitutional condemnation is still good law and whether Oncor has pleaded a viable constitutional claim that the City's threatened taking would be void because no appropriate procedure exists to ascertain and compensate it for the value of the Streetlight System as a "going concern."

**B.      Governmental Immunity Is Waived for Oncor's Claims for Equitable Relief**

In *Lone Star Gas*, the Texas Supreme Court considered similar facts to those presented here. 98 S.W.2d at 799. After the City of Fort Worth threatened to condemn a gas-utility system that Lone Star owned and operated within the city, Lone Star filed suit to enjoin the threatened condemnation. *Id.* Lone Star argued that the threatened taking by condemnation proceedings was "without right or authority in law, and if permitted would violate its rights under article 1, § 17 of the Constitution of the state of Texas." *Id.* at 799-800. Similarly to the City in this case, Fort Worth argued that the county court at law had exclusive jurisdiction over condemnation proceedings, and thus, Lone Star could only challenge the threatened condemnation

20

as unconstitutional in a condemnation proceeding once Fort Worth filed one in the county court at law. *Id.* at 800-01.

The supreme court rejected that argument, explaining that Lone Star's challenge to the condemnation proceedings "involves an inquiry as to the existence of legislative authority to exercise the power to condemn, which, if absent, is such a limitation upon the county court's power to proceed as makes its action void if it does proceed." *Id.* at 801. Moreover, the court explained that "[i]t is universally recognized that an attempt, or threatened attempt, to take private property for public use by virtue of eminent domain may be restrained by injunction when the proceeding is for any reason void." *Id.* (citing cases). The court held that "injunction is the appropriate remedy, when there is a threatened taking in any proceeding which may be void for any reason." *Id.*; *accord Brown v. Lower Colo. River Auth.*, 485 S.W.2d 369, 371 (Tex. App.—Austin 1972, no writ) (noting that examples of void condemnation proceedings provided in *Lone Star* include "those (1) *conducted under an inapplicable statute*, or (2) under a statute which is unconstitutional, or (3) where the property sought to be taken is not within the area in which the condemning authority has power of eminent domain" (emphasis added)).

More modern cases on governmental immunity in the context of injunctive relief confirm that *Lone Star*'s holding remains good law. *See, e.g.*, *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007) (per curiam). In *City of Elsa*, the Texas Supreme Court reaffirmed that "governmental entities may be sued for injunctive relief under the Texas Constitution." *Id.* at 391. The plaintiffs there sought equitable and injunctive relief for alleged constitutional violations by the city. *Id.* The city argued that governmental immunity barred the suit against the city, but the Supreme Court disagreed, reiterating its decision in *City of Beaumont v. Bouillion,* 896 S.W.2d

143, 149 (Tex. 1995), "that 'suits for injunctive relief' may be maintained against governmental entities to remedy violations of the Texas Constitution." *City of Elsa*, 226 S.W.3d at 392.

Although the City acknowledges the supreme court's holding in *Bouillion* allowing a plaintiff to seek equitable remedies for an unconstitutional action, it contends that Oncor has not identified any unconstitutional action by the City. The City contends that Oncor's allegation that the Streetlight System cannot be taken in a condemnation proceeding does not identify an unconstitutional action by the City. The City urges that because Oncor would be able to assert a claim for compensation for the taking of the Streetlight System in a condemnation proceeding, if the City were to initiate one, no constitutional violation either has or could occur. *See* Tex. Const. art. I, § 17 (establishing that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation"). We disagree. Oncor alleges that the City's threatened condemnation violates the constitutional mandate in the takings clause by subjecting it to a void process because a condemnation proceeding under Chapter 21 cannot adequately compensate it for the taking of the Streetlight System, which is a "going concern." *See Lone Star*, 98 S.W.2d at 801. Having determined that this concrete injury alleged by Oncor is sufficiently imminent to present a ripe controversy, we conclude, under *Bouillion* and *Lone Star*, that the trial court has jurisdiction to consider Oncor's claims seeking to enjoin the City's unconstitutional action if Oncor has alleged a viable constitutional claim.

Before turning to the viability of Oncor's constitutional claim, we address the City's argument that "Oncor's claims rest solely on the [UDJA]," and the UDJA only waives governmental immunity in a narrow set of cases in which the plaintiff challenges the validity of statute or an ordinance. *See Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 & n.3 (Tex. 2011). In *Sefzik*, the Texas Supreme Court explains that the UDJA waives governmental immunity

22

for this type of validity challenge because the statute "expressly requires joinder of the governmental unit." *Id.* at 622 n.3 (citing Tex. Civ. Prac. & Rem. Code § 37.006(b)). The City contends that Oncor's declaratory-judgment claims are barred by immunity because "the UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law." *Id.* at 621. The City characterizes Oncor's claims only as seeking a declaration of its rights under Chapter 21 of the Property Code, Chapter 251 of the Texas Local Government Code, and the Texas Constitution. While Oncor alleges that these condemnation statutes do not authorize the City's threatened condemnation and thus a condemnation proceeding against it would be unconstitutional, we conclude that Oncor's request for declaratory relief in substance challenges the validity and constitutionality of the condemnation statutes' application to the City's threatened condemnation of Oncor's "going concern." In addition, Oncor's claims do not rest solely on the UDJA; it also seeks injunctive relief to prevent the threatened condemnation proceeding, and we have concluded immunity is waived for deciding Oncor's underlying action for injunctive relief. *See Texas Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011) ("[G]enerally, the [U]DJA does not alter a trial court's jurisdiction. Rather, the [U]DJA is 'merely a procedural device for deciding cases already within a court's jurisdiction.'" (citations omitted)). Thus, we conclude that the UDJA's waiver of immunity applies to Oncor's challenge to the validity and constitutionality of the condemnation statutes' application in the going-concern context.

### C. The City's Immunity Is Waived for Oncor's Viable Constitutional Claim

As explained above, the Texas Constitution authorizes suits for equitable or injunctive relief for violations of the Texas Bill of Rights, *see Bouillion*, 896 S.W.2d at 148-49, but

to invoke this limited waiver of immunity, the plaintiff must plead a viable constitutional claim, *City of Houston v. Downstream Env't, L.L.C.*, 444 S.W.3d 24, 38 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *see also Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011) (citing, *e.g.*, *City of Elsa*, 226 S.W.3d at 392; *Bouillion*, 896 S.W.2d at 149).

"The protection of one's right to own property is said to be one of the most important purposes of government. That right has been described as fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions." *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977). As the Texas Supreme Court recently reiterated, "[t]he Texas Constitution helps ensure that government fulfills this purpose by providing a robust right to adequate compensation—and waiver of immunity—if a person's property is 'taken, damaged, or destroyed for or applied to public use . . . unless by the consent of such person.'" *Texas Dep't of Transp. v. Self*, 690 S.W.3d 12, 25 (Tex. 2024) (quoting Tex. Const. art. I, § 17(a); citing *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980)).

Oncor alleges that the City's threatened condemnation of the Streetlight System under Chapter 21 violates the constitutional mandate in the takings clause because it would subject Oncor to a void process and that the holding in *Lone Star* supports the viability of its constitutional claim. Oncor seeks to enjoin what it alleges is "an unconstitutional and unlawful attempt to effectuate the taking of a utility business as a going concern." In *Lone Star*, Fort Worth sought to take Lone Star's entire gas-distributing system and the various tangible and intangible property that constituted the system. 98 S.W.2d at 799. In its petition, Oncor alleges that the City is attempting to take the Streetlight System so that it can "provide the same [streetlight] service that Oncor already furnishes," and the City has acknowledged that if it takes the Streetlight System, it will either operate the System itself or contract with an alternate operator. The court held in *Lone*

24

*Star* that the Constitution precludes a city from initiating a condemnation proceeding against a utility if the condemnation would take not only the utility's real property but also the "going concern" value of its business. *See id.* at 803-806 (concluding that statutory condemnation procedures were not intended to apply to this type of proceeding and that there was no statutory procedure for ascertaining just compensation to be paid for taking going concern).

The City asserts that the Local Government Code empowers it to "use eminent domain authority to appropriate real property, rights-of-way, or other property as necessary" to "buy, own, . . . and maintain and operate a[n] electric lighting plant . . . or other public service or public utility" as long as it adequately compensates the condemnee. Tex. Loc. Gov't Code § 552.002(b). While Section 552.002(b) authorizes the exercise of eminent-domain authority for this purpose, other language contained in Section 552.002(b) supports Oncor's argument that Chapter 21 condemnation proceedings are not intended to be used in this situation. The statute provides that "[i]n its charter, the municipality may adopt rules it considers advisable for the *acquisition* or operation of the public service or public utility." *Id.* (emphasis added).

The court in *Lone Star Gas* analyzed the condemnation statute then in effect, which operated similarly to today's condemnation statute, *see* 98 S.W.2d at 804-805, and a statutory provision virtually identical to Section 552.002(b), *see id.* at 805. The court concluded as follows:

> The fact that in connection with this particular power the Legislature has provided that the city may adopt by its charter such rules and regulations as it may deem advisable for acquiring public utilities, and has not made a similar provision with reference to other powers, is potent proof that the Legislature thought the general statutes were not sufficient, in the event of an attempted exercise of this particular power. It is further convincing evidence that the Legislature intended to condition the exercise of this power upon the adoption by the city of sufficient and adequate rules and regulations for "acquiring" such utilities. It is admitted that the City of Fort Worth has never made any such provisions in its charter. We think it is true,

25

> therefore, that the power given to the city to take and appropriate the business and properties of a public utility lies dormant.
>
> It follows, we think, that the threatened attempt to take and appropriate plaintiff's business and properties in the absence of adequate and appropriate machinery for ascertaining the constitutional compensation which plaintiff would be entitled to receive, if permitted to be pursued, would be void; and injunction was the proper remedy for preventing such attempt.

*Id.* The same situation that was present in *Lone Star* is present here. The City seeks to take over the entire Streetlight System, but Texas law does not provide a mechanism for "assessing the compensation to be paid a public utility for the taking of its business and plant as a going concern." *Id.* at 804 (concluding condemnation statute's provisions "are wholly inappropriate, inapplicable, and insufficient" for this purpose).

The City argues that *Lone Star*'s holding does not apply here because the Streetlight System is not a regulated utility for which no adequate compensation for the "going concern" value can be awarded in a Chapter 21 proceeding. The "going concern" value of a business refers to the business's intangible value, which is made up of such elements as its goodwill, managerial efficiency, and ability to attract customers. *See, e.g.*, *Kimball Laundry Co. v. United States*, 338 U.S. 1, 9-11 (1949); *Lone Star*, 98 S.W.2d at 803. In most condemnation situations, compensation for going-concern value is not required by either the federal or Texas constitutions because the owner is free to move his business to a new location when only the physical property has been condemned. *Kimball Laundry*, 338 U.S. at 11. In *Kimball Laundry*, the U.S. Supreme Court explained that

> [t]he situation is otherwise, however, when the Government has condemned business property with the intention of carrying on the business, as where public-utility property has been taken over for continued operation by a governmental

26

> authority. If, in such a case, the taker acquires going-concern value, it must pay for it.

*Id.* at 12.

The City urges that this going-concern exception to the general rule applies only to regulated water, sewer, or electric utilities, which cannot relocate their business operations and "cannot ordinarily be operated profitably except as a monopoly," meaning that even if the former owner of the utility invested in duplicating the condemned facilities, it would have no prospect of a profitable return. *Id.* at 12-13. The City acknowledges that Texas courts have concluded that attempted takings by municipalities of regulated utilities are impermissible because "Texas law has no mechanism to award going-concern compensation." *See Lone Star*, 98 S.W.2d at 805; *City of Blue Mound v. Southwest Water Co.*, 449 S.W.3d 678, 692–93 (Tex. App.—Fort Worth 2014, no pet.) (affirming summary judgment on ground that no statutory procedures exist authorizing City of Blue Mound's attempt to condemn Southwest's water and wastewater system as going concern "because as a matter of law [Southwest is] entitled to compensation for going-concern value as an element of this purported taking, because the general Texas condemnation statutes provide no mechanism for the awarding of going-concern value as held in *Lone Star Gas Co.*, and because *Lone Star Gas Co.* remains binding precedent"); *City of Houston v. Southern Water Corp.*, 678 S.W.2d 570, 572 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd) (affirming trial court's temporary injunction prohibiting City of Houston from condemnation of sanitary-sewer and water-supply systems of Hidden Valley subdivision that had been annexed by City of Houston based on *Lone Star*'s holding that takings under general condemnation statutes are limited to real estate, and that absent process established by general statute or city's charter, city cannot condemn going-concern aspects of business). The City contends, however, that the holdings in these cases are

limited only to attempted takings of an entire regulated utility system and that the Streetlight System is not such a regulated utility, so therefore, *Lone Star*'s holding does not apply in this case.

We disagree that the holdings in *Lone Star* and *Kimball Laundry* are limited only to a municipality's attempt to take a regulated utility. Although *Kimball Laundry* gives the government's condemnation of a utility for continued operation by a governmental authority as an example of a situation where the going-concern value must be paid for by the condemning entity, it does not limit its holding only to utilities. 338 U.S. at 12-13. The Supreme Court states that in utility cases, because the utility can only be operated profitably as a monopoly, the condemning entity assures itself of freedom from the former owner's competition and that owner retains nothing of its going-concern value. *Id.* But the Supreme Court goes on to state that "the public-utility cases plainly cannot be explained by the fact that the taker received the benefit of the utility's going-concern value." *Id.* at 13. Instead,

> [t]he rationale of the public-utility cases, as opposed to those in which circumstances have brought about a diminution of going-concern value although the owner remained free to transfer it, must therefore be that an exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable 'taking' of property.

*Id.* Accordingly, the Supreme Court applied this principle to the government's wartime takeover of a laundry plant for military use for several years during World War II because during the period of the government takeover, the laundry-plant owners were completely deprived of the going-concern value of their business. *Id.* at 13-14.

Therefore, we need not decide whether the Streetlight System, a discrete segment of Oncor's regulated TDU, which is governed by its Tariff, is itself a regulated utility to decide that the City's threatened taking is the type of taking that would have "the inevitable effect of

28

depriving the owner of the going-concern value of his business." *Id.* at 13. The City's stated purpose in condemning the Streetlight System is to take over its operation. And under *Lone Star*, which remains binding precedent, because the general Texas condemnation statutes provide no mechanism for the awarding of going-concern value, we conclude that Oncor has stated a viable constitutional claim for which the City's immunity is waived. 98 S.W.2d at 805 (concluding injunction was proper remedy for preventing City of Fort Worth's attempt to take Lone Star's business and properties "in the absence of adequate and appropriate machinery for ascertaining the constitutional compensation which plaintiff would be entitled to receive").

We overrule the City's second issue.

## CONCLUSION

Having overruled the City's issues, we affirm the trial court's denial of the City's plea to the jurisdiction.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly
  Dissenting Opinion by Justice Kelly

Affirmed

Filed:  February 28, 2025

29